William **HEIRENS**, Petitioner-Appellee,

v.

Larry **MIZELL, et al.,**
**Respondents-Appellants.**

No. 83–1748.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 12, 1983.
Decided Feb. 24, 1984.*

---

* This opinion has been circulated among all judges of this court in regular active service. No judge favored a rehearing *en banc* on the question of overruling *Welsh v. Mizell,* 668 F.2d 328 (7th Cir.), *cert. denied,* 459 U.S. 923, 103 S.Ct. 235, 74 L.Ed.2d 186 (1982).

Charles W. Murdock, Asst. Atty. Gen., Joan S. Cherry, Cook County Asst. State's Atty., Steven F. Molo and Mark A. Ratert, Asst. Attys. Gen., Chicago, Ill., for respondents-appellants.

Michael B. Nash, Chicago, Ill., for petitioner-appellee.

Before PELL and COFFEY, Circuit Judges, and NEAHER, District Judge.**

COFFEY, Circuit Judge.

The respondents appeal from the April 20, 1983 order of Magistrate Gerald B. Cohn releasing the petitioner, William Heirens, on parole. Although several issues have been raised by both the petitioner and the respondents, we believe only two merit extended consideration: (1) whether this court's decision in *Welsh v. Mizell,* 668 F.2d 328 (7th Cir.), *cert. denied,* 459 U.S. 923, 103 S.Ct. 235, 74 L.Ed.2d 186 (1982) incorrectly determined that the application of the second of three parole criteria established by Illinois legislation, effective January 1, 1973, to parole applicants who committed their crimes before that date, violated the *ex post facto* clause of the United States Constitution;[1] and (2) whether the reasons given by the Illinois Parole and Pardon Board for denying the petitioner parole violated the petitioner's due process rights as delineated in this court's *U.S. ex rel. Scott v. Ill. Parole and Pardon Bd.,* 669 F.2d 1185 (7th Cir.), *cert. denied sub nom. McCombs v. Scott,* 459 U.S. 1048, 103 S.Ct. 468, 74 L.Ed.2d 617 (1982) decision. We REVERSE.

## I.

On September 4, 1946, William Heirens pleaded guilty, in the criminal court of Cook County, Illinois to three murder indictments and twenty-six other indictments

** The Honorable Edward R. Neaher, District Judge of the United States District Court for the Eastern District of New York, is sitting by designation.

1. "No State shall ... pass any ... *ex post facto* law." U.S. Const. art. I, § 10, cl. 1.

charging various assaults, burglaries and robberies. He was sentenced to three consecutive life sentences on the murder indictments. In addition, the court imposed the statutory sentences on the remaining indictments. The court ordered that the latter sentences run concurrent with each other but consecutive to the three life terms.

On August 31, 1981, Heirens filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 in the United States District Court for the Southern District of Illinois. Heirens alleged that the Illinois Parole Board violated the *ex post facto* clause of the United States Constitution when it denied him parole solely on a criterion established after the commission of the above-noted offenses. The respondents acknowledged that under our then recent decision in *Welsh v. Mizell*, 668 F.2d 328 (7th Cir.1982), it was inappropriate to apply the second of three parole criteria promulgated by the Illinois legislature in 1972, to parole applicants whose crimes preceded January 1, 1973. The *Welsh* court held that the second criterion of Ill.Rev.Stat. ch. 38, § 1003–3–5(c),[2] providing that parole must be denied if the prisoner's "release at that time would deprecate the seriousness of his offense or promote disrespect for the law," was a marked departure from previous practice. According to *Welsh*, the enactment of the second criterion imported "for the first time into the parole decision considerations of retributive justice (the relationship between time served and the nature of the offense) and general deterrence

(incarceration as a means of promoting general respect for law)." *Id.* at 331 (footnote omitted). *Welsh* concluded that "the retrospective application of the general deterrence criteria violates the *ex post facto* clause." *Id.*

On July 15, 1982, Magistrate Cohn granted the petitioner's writ and ordered the respondent Parole Board to provide Heirens with another parole hearing consistent with the *Welsh* decision. He also instructed the Board to "provide a sufficiently detailed statement of the 'essential facts' relied upon ..." in making its determination. While noting that the decision whether or not to grant a prisoner's request for parole was one "delegated solely" to the Illinois Parole Board, the Magistrate required that the Board explain "what, if any, legally acceptable criteria were utilized when they denied parole to Mr. Heirens in 1979 and the years since then." If the Board found that it had in fact denied parole in 1979 and subsequent years based exclusively on the now-unacceptable criterion (2), the Board could continue to deny parole only "by specifically detailing the developments since 1979 which, according to presently acceptable criteria, justify a denial of parole."

In response to that order, the Board held a parole hearing for Heirens on August 10, 1982. Six days later the Board issued an order and rationale[3] denying Heirens' release on parole. It subsequently issued an amended rationale on August 24, 1982, to correct certain misstatements in its previous rationale.[4]

---

**2.** Ill.Rev.Stat. ch. 38, § 1003–3–5(c) provides:

"(c) The Board shall not parole a person eligible for parole if it determines that:
"(1) there is a substantial risk that he will not conform to reasonable conditions of parole; or
"(2) his release at that time would deprecate the seriousness of his offense or promote disrespect for the law; or
"(3) his release would have a substantially adverse effect on institutional discipline."

**3.** The Board provides a parole applicant with a written statement of the reasons for its action pursuant to Ill.Rev.Stat. ch. 38, § 1003–3–5(f).

**4.** The August 24, 1982 rationale essentially stated that the Board had completely reviewed Heirens' case and had decided that the risk of future non-conforming conduct was too great to allow release at that time. To justify its conclusion, the Board cited to the fact that Heirens had been convicted of three murders one of which was particularly heinous. In addition, the Board noted that, according to the statement of facts, Heirens stated that he had gained sexual satisfaction from these murders and other burglaries. The Board asserted that because the underlying cause of such behavior was unknown, Heirens' reaction to an unstructured environment was "difficult to predict." Finally, the Board stated that these reasons were sub-

On October 12, 1982, Heirens filed a "Motion for an Order to Show Cause Why the Respondent Prison Review Board Should Not be Held in Contempt for Failure to Comply with This Court's Order of July 15, 1982." On December 22, 1982, the Magistrate granted Heirens' motion holding that the Board had, in fact, failed to comply with his order of July 15, 1982. However, he stayed enforcement of this order for 30 days to provide the Board with an additional opportunity to comply. In this second order the Magistrate noted that the record contained evidence:

> "which strongly suggest[s] that Mr. Heirens has been denied parole in recent years for reasons that *Welsh* recently held to be impermissible. We noted in our Order [July 15, 1982 order] that the record strongly suggests that the Prisoner Review Board has long considered Mr. Heirens completely rehabilitated, and a good parole risk." [5]

Although the respondents correctly limited their consideration to criteria relating to "special deterrence" [6]—rehabilitation and the corresponding parole risk of the specific individual, etc.—Magistrate Cohn held that in light of the above-noted conflicting evidence in the record, the Board had failed to adequately delineate facts that substantiated that parole denial in 1979 and other recent years had, in actuality, been based on factors of special deterrence, and not on the now-unacceptable "general deterrence" criterion. The Magistrate concluded:

> "There is significant undisputed evidence in the record before us which suggests that the Board has long considered Mr. Heirens an excellent parole risk. If, as the Board now claims, this is not the case, then they must show this Court why the record before us is incorrect or misleading. If the Board, on further reconsideration, should determine that Mr. Heirens is rehabilitated and a good parole risk, then they must release him on parole pursuant to the current state of the law."

In an attempt to comply with the Magistrate's December 22, 1982 order, the Review Board issued an additional rationale on January 12, 1983. This rationale began with a statement addressing the evidence in the record that had troubled the Magistrate.

> "With specific regard to the comments at the hearing in November of 1979, of Mr. James Irving, former Board Chairman, and the fact that Mr. Irving may have expressed an opinion as to your rehabilitation, we would point out that Mr. Irving was speaking as one member, only, and apparently did not feel sufficiently convinced, himself, that you warranted parole according to the Board Order of that date."

The rationale continued by stating that although Heirens had performed well in a structured environment, the Board was not convinced that such performance would carry over to life in "the free society." Again, reference was made to the various factors the Board considered including his adjustment to institutional life, the underlying facts of the crimes to which he pled guilty and the length of the sentences imposed. Finally, the Board stated:

> "In conclusion, as previously noted during prior parole hearings, your academic achievements have been above average; however, in rendering its decision

stantially the same as those leading to parole denial in 1979 and subsequent years.

Heirens, that Heirens was "probably rehabilitated in the first 10 or 15 years."

---

**5.** Much of the evidence cited by the Magistrate to support this conclusion comes from a transcript of Heirens' November 27, 1979 parole hearing. Heirens stated under oath that he had made the transcript from a taperecording of that hearing. The veracity of this evidence was not contested by the respondents. According to that transcript, Parole Board Chairman James Irving stated, in response to questions asked by

**6.** The terms "special deterrence" and "specific deterrence" appear to be used interchangeably. *Compare Welsh,* 668 F.2d 328 (7th Cir.1982) where the term "special deterrence" is used, with *Salyes v. Welborn,* 725 F.2d 436 (7th Cir. Jan. 11, 1984) where the court uses the term "specific deterrence." In view of the fact that these terms are synonymous, we have adopted the "special deterrence" language of *Welsh.*

to deny parole at this time, it is this interviewing panel's opinion that to grant parole would not be in the best interest of society, nor would it serve as a deterrent to non-compliance with the established laws of society."

On April 20, 1983, the Magistrate ordered Heirens released from custody. He held:

"While it is certainly true that a District Court cannot substitute its judgment on questions of parole for that of the parole board, and the scope of review is very limited, *U.S. ex rel. O'Connor v. MacDonald*, 449 F.Supp. 291 (N.D.Ill. 1978), we are faced with a very different situation in the instant case. Here, we find that the respondents are violating the petitioner's federal due process rights in two distinct ways. First, they continue to explicitly apply illegal 'general deterrence' criteria to the parole application, despite having been repeatedly ordered not to do so. Second, to the extent that they also consider factors relating to 'special deterrence,' and conclude, in boiler plate language, that the petitioner is a poor parole risk, they have repeatedly refused to explain blatant contradictions in their own record. This Court determines that either of these continuing constitutional violations would justify this Order discharging the petitioner from custody."

\*　　\*　　\*　　\+　　\*　　\*

"Therefore, It Is The Order of this Court that the respondents release Mr. Heirens from incarceration. This Order is Stayed for twenty (20) days, however, since the respondents may wish to establish an appropriate parole plan. A brief extension of this twenty day period might be granted for good cause shown. By the end of this period of time, Mr. Heirens must be released from incarceration."

It is from this order of release that the respondents appeal.

## II.

Before reaching the main issues of this appeal, there are several collateral issues which warrant our consideration. The petitioner-appellee, Heirens, argues that there is no jurisdiction to entertain the respondents' attempt to relitigate matters resolved in the Magistrate's "final" order of July 15, 1982, from which the respondents did not appeal. Our jurisdiction in this case is based on 28 U.S.C. § 1291 which grants federal appellate courts jurisdiction over appeals from all final decisions of United States district courts, and on 28 U.S.C. § 2253 which provides that the final order in a habeas proceeding is subject to review by the court of appeals for the circuit where the proceeding took place. We hold that the petitioner's contention is without merit since, as the respondents point out, the July 15, 1982 order is not the order that directed Heirens' release from custody and did not terminate the litigation between the parties.

"A 'final decision' generally is one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Catlin v. United States*, 324 U.S. 229, 233, 65 S.Ct. 631, 633, 89 L.Ed. 911 (1945). "A final judgment in a habeas corpus case either denies the petition or orders the petitioner released at a specified time." *United States ex rel. Burton v. Greer*, 643 F.2d 466, 469 (7th Cir.), *cert. denied*, 454 U.S. 851, 102 S.Ct. 293, 70 L.Ed.2d 142 (1981). As in *Burton*, the July 15, 1982 order in the present case neither terminated the litigation on the merits nor ordered the release of Heirens. Instead, it simply ordered the Parole Board to provide Heirens with a new parole hearing within 30 days. It specifically recognized that the decision whether or not to grant parole was "delegated solely" to the Board. The Magistrate merely directed the Board "to avoid utilizing the [general deterrence] criteria prohibited by the *Welsh* decision" and "to provide a sufficiently detailed statement of the 'essential facts' relied upon by the Board" in making its parole determination. While the Magistrate called his decision a "final order," it did not end the litigation

between the parties. Rather, it appears to contemplate further proceedings since the July 15, 1982 order is couched in terms of "guidelines" to be used by the Board "upon remand" in making its parole decision. Furthermore, while the Magistrate stated that the petition was granted, *release* was *not* ordered; instead, the July 15, 1982 decision merely ordered a new *parole hearing:*

> "The Petition before this Court is hereby Granted and the respondents are Ordered to provide the petitioner with a new parole hearing consistent with this Order within thirty (30) days."

As the preceding quote clearly demonstrates, release was *not* ordered within a specified time, in fact, it was not ordered at all. Thus, the case falls within this court's *Burton* decision.[7] Even if no parole hearing had subsequently been provided, Heirens would *not* have been automatically released from custody. To gain that relief, he would have had to file a motion requesting that the court find the Parole Board in contempt and accompany that motion with a request for an order directing his release.

Essentially, the Magistrate's July 15, 1982 order asked the Parole Board whether it could provide adequate reasons for its denial in light of *Welsh* and *U.S. ex rel. Scott v. Illinois Parole and Pardon Bd.,* 669 F.2d 1185 (7th Cir.1982). Not until the Magistrate found that the Board failed to provide sufficient reasons which could be, in his view, supported by the record was the litigation at an end and Heirens' release ordered—the two benchmarks of a final order in a habeas action. As the Fifth Circuit stated in *Broussard v. Lippman,* 643 F.2d 1131 (5th Cir.), *cert. denied,* 452 U.S. 920, 101 S.Ct. 3059, 69 L.Ed.2d 425 (1981):

> "The order must not merely have the potential to be the final action, it must, in fact, *be* the final action of the district court .... Those adversely affected by a district court order should not have to speculate on whether or not that order will prove to be final."

*Id.* at 1133 (emphasis original).[8]

■ Note that the preceding analysis concluding that the first order was not the final appealable order also applies to the Magistrate's order of December 22, 1982 granting Heirens' motion to show cause since the Magistrate expressly stayed this second order for thirty days to give the Parole Board an additional opportunity to comply. The December 22 order explicitly stated that if the Board failed to comply within thirty days, contempt proceedings would be instituted before the court, and thus by its very language it did not "end" the litigation between the parties. Again the Magistrate did *not* order Heirens' release. As we have previously stated, it was not until the order of April 20, 1983 that the Magistrate determined that the Board could not or would not comply with his July 15, 1982 decision, and as a result ordered Heirens' release. Therefore, we hold that the Magistrate's only final order was that issued on April 20, 1983, from which the respondents properly appeal.

■ The respondents argue that this court should reconsider the Magistrate's factual determination that the record indicates the Board in actuality believed Heirens to be rehabilitated and a good parole risk. In so doing, they request that we examine a considerable amount of material which was not presented to the Magistrate. As the respondents state in their brief:

> "The Third Order thus indicated that the Magistrate had concluded, as a factu-

---

7. The fact that Heirens' release was not specifically ordered until the Magistrate's April 20, 1983 decision distinguishes this case from *Browder v. Director, Illinois Dept. of Corrections,* 434 U.S. 257, 98 S.Ct. 556, 54 L.Ed.2d 521 (1978) since neither his first nor second order directed that Heirens be released at a specified time as was the case in *Browder. See Burton,* 643 F.2d at 469.

8. *See also Garcia v. United States Bd. of Parole,* 557 F.2d 100 (7th Cir.1977) where this court found that the order which actually released the petitioner was the final appealable order since the previous order failed to resolve the issue of whether the reasons given in support of the parole board's denial of parole were adequate.

al matter, what the 'Board's determination' was in Petitioner's case. The Magistrate reached this factual resolution without requesting, receiving or considering *any* of the pertinent documents contained in Appendix B, pages B.–1 through B.–99." (Emphasis original.)

We decline to review this additional material since it was not presented to the Magistrate for his consideration. It was the respondents' duty to offer any material they believed to be relevant to the Magistrate's ultimate determination and their failure to fulfill that duty precludes review of such material on appeal. We note, however, that in the future if the Magistrate or trial court is aware that such material exists, and believes that it is relevant to his/her determination he/she should request that it be presented.

■ The respondents next argue that the present action is barred by *res judicata.* They base their argument on the fact that in 1980, the petitioner filed a suit under 42 U.S.C. § 1983 asserting that Illinois had violated the *ex post facto* clause of the United States Constitution by denying him parole based solely on a factor (general deterrence) which was added to the relevant parole considerations subsequent to the commission of his crimes. The district court held that Ill.Rev.Stat. ch. 38, § 1003–3–5(c)(2) when applied to inmates who committed their crimes prior to its enactment did not violate the *ex post facto* prohibition. That decision has been separately appealed to our court and is presently pending. The respondents argue that the resolution of the § 1983 action bars Heirens' habeas corpus petition under the principles of *res judicata.* We find this argument to be without merit. As our court recently stated in *Warren v. McCall,* 709 F.2d 1183, 1184 n. 4 (7th Cir.1983), "a decision in another case is not res judicata as to a habeas proceeding." *See also* 18 Wright, Miller & Cooper, *Federal Practice and Procedure,* § 4405 at 39 (1981); *Salinger v. Loisel,* 265

U.S. 224, 230, 44 S.Ct. 519, 521, 68 L.Ed. 989 (1924); *Smith v. Yeager,* 393 U.S. 122, 124, 89 S.Ct. 277, 278, 21 L.Ed.2d 246 (1968); and *Hardwick v. Doolittle,* 558 F.2d 292, 295 (5th Cir.1977), *cert. denied,* 434 U.S. 1049, 98 S.Ct. 897, 54 L.Ed.2d 801 (1978).[9]

■ Finally, the respondents contend (based in part on the *amicus curiae*'s argument) that Heirens failed to exhaust his state remedies and therefore the present action should be dismissed without prejudice. They recognize that Heirens brought a state habeas proceeding raising the *ex post facto* issue which was denied by the Illinois court in an unpublished order cited as *Heirens v. Mizell,* 89 Ill.App.3d 1208, 48 Ill.Dec. 875, 417 N.E.2d 277 (5th Dist.1980). However, they argue that a habeas petition is an inappropriate vehicle to obtain the relief sought. According to the respondents, the appropriate vehicle for challenging whether certain parole criteria "have been properly applied" in Illinois is a mandamus action. Whether appropriate or not, the Fifth District Illinois Appellate Court reached the merits of Heirens' *ex post facto* claim and denied it based on its previous decision in *Harris v. Irving,* 90 Ill.App.3d 56, 45 Ill.Dec. 394, 412 N.E.2d 976 (5th Dist.1980).

"Exhaustion is a matter not of jurisdiction, but of comity; the federal courts should not act until the state courts have had an opportunity to correct federal constitutional errors." *U.S. ex rel. Cunningham v. DeRobertis,* 719 F.2d 892, 894 (7th Cir.1983) (*citing Rose v. Lundy,* 455 U.S. 509, 518, 102 S.Ct. 1198, 1203, 71 L.Ed.2d 379 (1982)). No federalism purpose would be served by requiring Heirens to litigate in an Illinois court under the "appropriate means." The Illinois Appellate Court did *not* dismiss for failure to raise the issue in a mandamus action, rather it reviewed the merits and declined relief based on its previous holding in *Harris v. Irving.* Thus,

---

**9.** Both the present habeas action and the § 1983 action are before this panel. Our refusal to decide the merits in this case would merely transfer the consideration to the § 1983 appeal.

We have decided to meet the issue in the habeas action. We also reject respondent's motion that Heirens' § 1983 action was in effect a habeas petition.

the state court has had a fair opportunity to correct the alleged constitutional error. Furthermore, there is a question whether any post-conviction relief remains available in Illinois. In *People v. James,* 46 Ill.2d 71, 263 N.E.2d 5 (1970) the Illinois Supreme Court stated:

"We have heretofore consistently held that where a convicted person has appealed from the judgment of conviction, the judgment of the reviewing court makes *res judicata* all issues actually decided by that court and all issues which could have been presented to that court and which were not are considered to have been waived."

263 N.E.2d at 7. A "[p]etitioner need not pursue post-conviction relief if it would be futile." *U.S. ex rel. Cunningham v. De Robertis,* 719 F.2d at 895 (*citing Duckworth v. Serrano,* 454 U.S. 1, 102 S.Ct. 18, 70 L.Ed.2d 1 (1981)). We believe it would be futile to require Heirens to relitigate in the Illinois courts the *ex post facto* claim. We therefore hold that Heirens' claim has been adequately exhausted.

■ We note that in any event the respondents have waived any argument regarding exhaustion since they failed to raise this issue in the proceedings before the district court. *See United States v. Carter,* 720 F.2d 941, 945 (7th Cir.1983); *Holleman v. Duckworth,* 700 F.2d 391, 394–95 (7th Cir.1983); and *United States ex rel. Moore v. Brierton,* 560 F.2d 288, 291 (7th Cir.1977), *cert. denied,* 434 U.S. 1088, 98 S.Ct. 1285, 55 L.Ed.2d 794 (1978).

## A. *EX POST FACTO*

The first of the two remaining issues to be addressed in this opinion is whether our court mistakenly determined in *Welsh v. Mizell,* 668 F.2d 328 (7th Cir.1982) that the application of the second of three criteria enacted by the Illinois Legislature in 1972, Ill.Rev.Stat. ch. 38, § 1003–3–5(c)(2) (1973), to parole applicants who committed their crimes before the effective date of that legislation, violates the Constitution's proscription against *ex post facto* laws.[10] As the *Welsh* court noted:

"In 1972, the Illinois legislature enacted new parole criteria based on the Model Penal Code. These criteria, which took effect on January 1, 1973, provide for the denial of parole if:

(1) there is substantial risk that [the prisoner] will not conform to reasonable conditions of parole; or

(2) his release at that time would deprecate the seriousness of his offense or promote disrespect for the law; or

(3) his release would have a substantially adverse effect on institutional discipline. Ill.Rev.Stat.1973, ch. 38 § 1003–3–5(c) (Ill.Rev.Stat.1979, *id.*)"

*Welsh,* 668 F.2d at 330–31. In reference to this legislation, the *Welsh* court held:

"Criteria (1) and (3) invite the Parole Board to look at many of the same factors as under previous law. Criterion (2), however, is a marked departure, importing for the first time into the parole decision considerations of retributive justice (the relationship between time served and the nature of the offense) and general deterrence (incarceration as a means of promoting general respect for the law). Furthermore, the statute allows any one of the criteria to serve as a basis for parole denial. Not only is criterion (2) new, therefore, but it can also be determinative. The district court failed to recognize that Welsh's petition presented exactly that case: the Parole Board gave only the second of the three factors as its reason for denying parole, and that factor could not have had decisive weight under the Board's 1962 procedures."

*Id.* at 331 (footnotes omitted).

The *Welsh* court examined both the Illinois statutes governing parole and the Parole Board's regulations in arriving at its

10. We note in passing that, while not material to the disposition of this case, Heirens' present challenge is somewhat ironic since he opposes the application of a supposedly *ex post facto* parole statute to him, yet at the same time is claiming the benefits of legislation which considerably reduced the time he would have otherwise spent in certain incarceration.

determination that criterion (2) was a departure from prior practice. The court quoted from Ill.Rev.Stat. ch. 38, § 806 (1961), which required:

> "the sentencing judge and the State's Attorney to transmit to the Parole Board an official statement of all 'facts or circumstances which may tend to throw light on the question as to whether such prisoner ... is capable again of becoming a law-abiding citizen.' "

*Id.* at 330. Except for two unimportant language changes—the substitution of the word "or" for "and" and "on" for "upon,"—the 1961 version of the statute is identical to Ill.Rev.Stat. ch. 38, § 806 (1945) which was in effect when Heirens committed the crimes for which he was sentenced. The *Welsh* court also quoted from Ill.Rev. Stat. ch. 38, § 808a (1961) which:

> "required the Parole Board to give 'due consideration and weight ... to the record of the prisoner's conduct kept by the superintendent or warden."

*Welsh,* 668 F.2d at 330. The 1945 version of this statute is likewise identical. *See* Ill.Rev.Stat. ch. 38, § 808a (1945). *Welsh* then quoted two Parole Board regulations:

> "12. If the members of the Parole and Pardon Board in conference determine that a prisoner serving an indeterminate sentence is entitled to parole, they shall enter an order for parole. If they determine that a prisoner is not a fit person to serve his sentence outside the penitentiary, parole shall be denied, and such further order entered as in the judgment of the members is warranted.

> \* \* \* \* \* \*

> "14. In its consideration of the question of whether a prisoner should be paroled, the Parole and Pardon Board shall evaluate all the factors in each case, including the prisoner's conduct record, and grant or deny release on parole in accordance with its judgment."

*Welsh,* 668 F.2d at 330. These regulations, with a few irrelevant deviations, are also identical to those existing in 1945.

Based on the preceding statutes and regulations, the *Welsh* court concluded:

> "Thus the focus of the Parole Board's inquiry was on the prisoner himself, as observed by the prosecuting and sentencing authorities and by prison officials. The purpose of incarceration had been served—and parole was appropriate—when the individual prisoner was deterred from engaging in further criminal activity and his conduct demonstrated his rehabilitation. The severity of the offense committed and society's concern with sufficient punishment did not enter directly into the Parole Board's decision."

*Id.* Building on this conclusion, the court determined, as previously noted, that the second criterion (release would deprecate the seriousness of the prisoner's offense or promote disrespect for the law, i.e., general rather than special deterrence) if applied to parole applicants who committed their offenses prior to the effective date of the enacting legislation (January 1, 1973), violated the *ex post facto* clause of the Constitution. This conclusion obviously resulted from the court's position that prior to 1973 principles of general deterrence were not considered by the Parole Board in making its parole decisions.

 Keeping in mind this overview of the *Welsh* decision, we now undertake a re-examination of the question of whether the application of criterion (2) to parole applicants whose crimes preceded its enactment violates the *ex post facto* clause. In its most recent explanation of that clause, the United States Supreme Court stated:

> "The *ex post facto* prohibition forbids the Congress and the States to enact any law 'which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed.' *Cummings v. Missouri,* 71 U.S. 277, 325–26, 18 L.Ed. 356, 4 Wall. 277, 325–26 (1867).... Through this prohibition, the

Framers sought to assure that legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed.... The ban also restricts governmental power by restraining arbitrary and potentially vindicative legislation....

"In accord with these purposes, our decisions prescribe that two critical elements must be present for a criminal or penal law to be *ex post facto:* it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it."

*Weaver v. Graham,* 450 U.S. 24, 28–29, 101 S.Ct. 960, 963–964, 67 L.Ed.2d 17 (1981) (citations and footnotes omitted). Thus, as the preceding quote explicitly states, in order for a law to violate the *ex post facto* prohibition of the United States Constitution it must be both (1) retrospective and (2) disadvantageous to the offender affected by it. Upon reconsideration of the issue presented to this court in *Welsh,* we hold that prior to the enactment of criterion (2) in 1972, the Illinois Parole Board possessed broad discretion with regard to parole decisions, and that in the exercise of its discretion the Board could in fact consider principles of general deterrence and retributive justice.[11] Thus, by incorporating such considerations into criterion (2), the 1972 legislation, in effect, merely codified prior law. Based on this holding we conclude that the application of criterion (2) to inmates who committed their crimes prior to 1973 is *not* disadvantageous since principles of general deterrence and retributive justice entered into the parole decision prior to 1973. Because one of the critical elements for a law to be *ex post facto* under *Weaver* is miss-ing—that the law be disadvantageous to the offender affected by it—the application of criterion (2) to inmates whose crimes were committed prior to 1973 does not violate the *ex post facto* prohibition of the Constitution. We therefore reverse our holding to the contrary in *Welsh v. Mizell,* 668 F.2d 328 (7th Cir.1982).

As noted above, in order to find a violation of the *ex post facto* clause, the *Welsh* court was compelled to hold that prior to January 1, 1973,—the effective date of the Illinois legislation establishing the disputed criterion—the Parole Board did not consider elements of general deterrence, as contained in the criterion (2), in making its parole decisions, that is, that the Parole Board did not concern itself with the question of whether a prisoner's "release at that time would deprecate the seriousness of his offense or promote disrespect for the law." Ill.Rev.Stat. ch. 38, § 1003–3–5(c)(2). Thus, the *Welsh* court determined that the second criterion imported "for the first time into the parole decision considerations of retributive justice ... and general deterrence ...." Our examination of the law as it existed prior to 1973 leads us to the opposite conclusion. We hold that prior to 1973 the Parole Board possessed broad discretion that allowed it to consider both principles of retributive justice and general deterrence in its parole decisions.

To illustrate its conclusion that the 1972 legislation imported for the first time "considerations of retributive justice ... and general deterrence," the *Welsh* court cited in a footnote to an article written by former Parole Board Chairman, Theodore P. Fields. Rather than supporting the *Welsh* majority, the article clearly states that it had, for some time, been the practice of the

---

**11.** It should be noted that there are few reported decisions which delineate the actual criteria considered by the Parole Board in 1945. The most persuasive authority that the Parole Board considered principles of general deterrence prior to 1973 is found in an Illinois Bar Journal article authored by former Parole Board Chairman, Theodore P. Fields. Fields, *Illinois Parole and Pardon Board Adult Parole Decisions,* 62 Ill.B.J. 20 (1973). *See* discussion of this article, *infra.* Mr. Fields states in that article that the Parole Board considered the criteria codified in Ill.Rev.Stat. ch. 38, § 1003–3–5(c) for "some time" prior to that legislation's enactment. We are not surprised by the lack of decisional evidence since until recently, challenging a parole decision was an exercise in futility. In addition, the requirement that the Board delineate its reasons for denying parole (the requirement which ultimately provides the basis for the present action) is a most recent development in the law.

Parole Board to consider factors of general deterrence and retributive justice. Specifically, Mr. Fields stated:

"The duties of the Parole Board are set forth by the Illinois Statutes. The new statute which became law in January, 1973 was drafted by progressive experts in the corrections field. What did they provide as to the factors that the Board must take into consideration when making parole decisions? The statute sets forth that 'the Board shall *not* parole a person eligible for parole if it determines that:

'(1) There is a substantial risk that he will not conform to the reasonable conditions of parole; or

'(2) his release at that time would deprecate the seriousness of his offense or promote disrespect for the law; or

'(3) his release would have a substantially adverse effect on institutional discipline.'

"*This statute sets forth the general criteria for denying parole that have been followed by the Board for some time.*"

Fields, *Illinois Parole and Pardon Board Adult Parole Decisions*, 62 Ill.B.J. 20, 20–21 (1973) (emphasis added). The last statement in the preceding quote is never qualified by Mr. Fields. In fact, Mr. Fields goes on to explain the second criterion in depth yet never even implies that this criterion represents a change from prior law. Thus, notwithstanding indications to the contrary in footnote 3 of *Welsh*, the Fields' article does not support the *Welsh* court's conclusion that the 1972 legislation created a change in the law, rather it clearly demonstrates that the enactment was merely *a codification* of the Board's prior practice.

 An examination of the statutes and regulations governing parole in both 1945 and 1962 (the time period relevant in *Welsh*) supports this conclusion. As *Welsh* correctly observed, under § 808a as it existed in both 1945 and 1962, the Parole Board was required to consider an applicant's record of conduct while imprisoned.

"In consideration of any application for parole due consideration and weight shall be given to the record of the prisoner's conduct kept by the superintendent or warden."

Ill.Rev.Stat. ch. 38, § 808a (1945). *See also* Ill.Rev.Stat. ch. 127, § 55b (1945) and Ill. Rev.Stat. ch. 38, § 808a (1961). While we do not deny that the Parole Board was required *to consider* a prisoner's record as one of the many factors relevant to its parole determination, this was the *only* limitation placed on the Parole Board's discretion over the parole decision. There was no requirement that parole be granted if the prisoner was found to be rehabilitated. Furthermore, there is nothing in this statute which limited or prohibited the Parole Board from denying parole based on general deterrence or retributive justice, if it were so inclined, notwithstanding a stellar prison record. The statute merely required consideration of the prisoner's conduct record but did not make that evidence determinative. We are convinced that had it been the legislature's intent to make prison conduct solely determinative of the parole question it would have stated that intent explicitly. Instead, the Parole Board was effectively given unlimited discretion in deciding whether or not to parole a particular prisoner with the single exception that the Board include in its consideration the prisoner's conduct record while confined. We cannot conclude, as the court did in *Welsh*, that the statute's requirement that the Board *consider* an applicant's prison record eliminated all other pertinent criteria, including general deterrence and retributive justice, from its lawful consideration, when the Parole Board's discretion was otherwise unlimited.

In support of its position, *Welsh* also cited to the Illinois statutes' requirement that the sentencing judge and the state's attorney furnish the Parole Board (in 1945 the Division of Correction) with a statement of the:

"facts and circumstances constituting the crime or offense whereof the prisoner or ward was convicted or committed, together with all other information acces-

sible to them in regard to the career of the prisoner or ward prior to the time of the commitment for the crime or offense of which he or she was convicted or committed relative to his or her habits, associates, disposition and reputation and any other facts and circumstances which may tend to throw light upon the question as to whether such prisoner or ward is capable again of becoming a law-abiding citizen .... "

Ill.Rev.Stat. ch. 38, § 806 (1945). *See also* Ill.Rev.Stat. ch. 38, § 806 (1961). Contrary to the *Welsh* court's implication,[12] the preceding statement included not only facts which cast light on whether the inmate could again become a law-abiding citizen, i.e., rehabilitation, but it also included information regarding the heinousness of the prisoner's crime or crimes, his prior criminal history and other pertinent facts concerning the convicted individual. While the court in *Welsh* concluded from the requirement of the above-noted statement that the focus of the Board was exclusively on the prisoner himself, and not on the interests of society, we have been unable to draw that same conclusion. We do not contest that rehabilitation was a factor to be considered in the parole decision. We are, however, unwilling to conclude based on either of the preceding statutes that the legislature intended that only factors of special deterrence were to be considered thereby eliminating elements of general deterrence and retributive justice from consideration in the parole decision. If these latter two factors were not relevant to the parole decision, then there would be no need for the post-sentencing report to include information regarding the circumstances and seriousness of the crime or crimes; such information having much greater relevance to the factors of general

deterrence and retributive justice than to rehabilitation.

The Parole Board's regulations as they existed in both 1945 and 1961 likewise support the conclusion that the Board had broad discretion prior to 1973. Regulation 14 as quoted by *Welsh* states:

"14. In its consideration of the question of whether a prisoner should be paroled, the Parole and Pardon Board shall evaluate *all* the factors in each case, *including* the prisoner's conduct record, and grant or deny release on parole in accordance with its judgment." [13]

668 F.2d at 330 (emphasis added). The use of the word "including" indicates that under this regulation the prisoner's conduct record was merely *one* factor among many to be considered by the Parole Board in making its decision whether to grant or deny parole. Certainly a common sense reading of this regulation does not lead one to the conclusion that rehabilitation was the *sole* focus of the parole determination prior to 1973, rather it simply delineates rehabilitation as one of the various factors to be considered.

 Parole Board Regulation No. 12, as set forth in *Welsh*, provided:

"12. If the members of the Parole and Pardon Board in conference determine that a prisoner serving an indeterminate sentence is entitled to parole, they shall enter an order for parole. If they determine that a prisoner is not a fit person to serve his sentence outside the penitentiary, parole shall be denied, and such further order entered as in the judgment of the members is warranted." [14]

---

**12.** In its reference to § 806, the *Welsh* court only cited to the last part of the above-noted quote requiring that the statement include those facts which shed light on whether the prisoner could again become a law-abiding citizen. The *Welsh* court's focus on the latter part of the above quote led it to conclude that § 806 supported its position that rehabilitation was the

sole focus of the parole decision prior to 1973. We do not agree.

**13.** In 1945, this regulation was number 15. Except for a few minor changes, irrelevant to the present analysis, it is identical to Regulation 15 as it existed in 1945.

**14.** In 1945, this regulation was number 13. Except for a few minor changes, irrelevant to the

Although the term "fit" as it is used in Regulation 12, raises at first glance an inference that rehabilitation is the determinative consideration, one would also not be a fit person for parole if in the judgment of the Parole Board (a) he had not been adequately punished (retributive justice), or (b) his release at the time would promote disrespect for the law (general deterrence). Again, if the drafters of the regulations had intended by the use of the word "fit" to mean "rehabilitated" they would have used the word "rehabilitated" expressly. Thus, the use of the word "fit" indicates that Regulation 12 likewise does not support the conclusion that factors of special deterrence, including rehabilitation, were the sole basis for parole either in 1961 or in 1945.[15] Rather, the term "fit" implies that to gain release, the prisoner must meet the requirements of parole in all respects, e.g., that he be rehabilitated and that factors of general deterrence and retributive justice do not warrant denial.

It should be apparent from the preceding analysis that principles of special deterrence, including rehabilitation, were not the sole determinative factors which thereby eliminated from the Board's discretionary parole decision any consideration of general deterrence and retributive justice. The statutes and regulations existing prior to 1973 merely indicate that the legislature, and the Parole Board, wanted to insure that some thought and consideration be given to an inmate's progress towards rehabilitation. Our review of the Illinois statutes and the Parole Board's regulations leads this court to conclude that rehabilitation standing alone did not mandate release. If that had been their intention, the legislature or the Parole Board would have clearly and unequivocally stated that only factors of special deterrence could be con-

sidered when deciding whether or not to grant parole. Instead, the statutes, and the regulations written pursuant to those statutes, gave the Parole Board broad discretion in making that decision.

Illinois case law supports our conclusion that considerations other than rehabilitation were taken into account by the Parole Board prior to 1973. For example, in *People v. Nowak*, 387 Ill. 11, 55 N.E.2d 63, *cert. denied*, 323 U.S. 745, 65 S.Ct. 67, 89 L.Ed. 597 (1944) the Illinois Supreme Court during its discussion of an equal protection claim stated:

"Plaintiff in error was twenty-four years of age when convicted and the sentence of one hundred years' imprisonment in the penitentiary is in effect a sentence for life. He has no right under the law to demand that he be discharged from the penitentiary during his lifetime.... The severity of the penalty imposed can not be relaxed except by action of the Governor under the powers conferred on him or by application of the provisions of the Parole Act. These may be granted as a matter of grace and not as of legal right. Such acts of leniency, whether by pardon or parole, are administered by the executive branch of the government *in the interests of society and the discipline*, education and reformation of the one convicted."

55 N.E.2d at 65 (citation omitted, emphasis added). Thus, in addition to the "education and reformation of the one convicted," consideration of the "interests of society" and "discipline" was part and parcel of the parole determination. Factors of general deterrence and retributive justice fall within this latter category.

In its final attempt to justify its conclusion that the 1972 Act created a change in the then existing law, the *Welsh* court

present analysis, it is identical to Regulation 13 as it existed in 1945.

**15.** Even if the term "fit" were interpreted to mean rehabilitated, Regulation 12 could not support the conclusion that rehabilitation was the sole factor to be considered in determining whether parole was to be granted. Under such an interpretation, Regulation 12 would merely

provide that if an inmate was found to be *not rehabilitated* ("fit"), parole *would automatically be denied*. It would not support the converse proposition that if an inmate was determined to be rehabilitated that release on parole would be mandated. Such a conclusion simply does not logically follow.

pointed out that in Illinois a convicted criminal is given both a minimum and maximum sentence.

> "The severity of the offense committed and society's concern with sufficient punishment did not enter directly into the Parole Board's decision. Those factors had already determined the minimum and maximum prison terms imposed by the sentencing judge. The minimum sentence was intended to satisfy society's desire for adequate punishment; the maximum sentence was a rough indicator of when rehabilitation could be presumed. The function of parole was to mediate between the two extremes. *People v. Moore*, 133 Ill.App.2d 827, 829, 272 N.E.2d 270, 271 (5th Dist.1971); *People v. Lillie*, 79 Ill.App.2d 174, 178, 223 N.E.2d 716, 718–719 (5th Dist.1967)."

*Welsh*, 668 F.2d at 330. The two cases cited by *Welsh* dealt solely with the length of the sentences imposed. Neither concerned the relevant considerations to be taken into account in the determination of whether or not to grant parole. Furthermore, there is no language in either of these cases indicating that principles of retributive justice, that is, punishment, and general deterrence should not be considered in making the parole decision. While we agree that "[t]he function of parole [is] to mediate between the two extremes," there is no reason why the Parole Board could not, prior to 1973, consider the adequacy of the punishment for the crime committed and the effect that release would have on the deterrence of others in its decision to grant or deny parole.[16]

Support for our conclusion that the Parole Board had broad discretion can also be found in the United States Supreme Court's decision in *Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979). While discussing the general due process requirements of parole hearings, the Supreme Court in

*Greenholtz* observed that the decision to grant or deny parole requires a:

> "predictive judgment as to what is best both for the individual inmate *and for the community*. This latter conclusion requires the Board to assess whether, in light of the nature of the crime, the inmate's release will minimize the gravity of the offense, weaken the deterrent impact on others, and undermine respect for the administration of justice."

*Id.* at 8, 99 S.Ct. at 2104 (emphasis added, footnote omitted). While the preceding quote was obviously not specifically concerned with Illinois law, this passage reinforces our holding that the Parole Board was not limited to merely considering factors of special deterrence prior to 1973 because society's interests have always weighed in the ultimate decision to grant or deny parole.

We conclude that the 1972 Illinois legislation delineating the parole criteria to be considered subsequent to January 1, 1973, did not enact a change in the factors the Parole Board used in making its parole determination, rather it merely codified the Board's prior practice and procedure, that is, it simply explicitly articulated the Parole Board's broad range of discretion which had always existed. Since the Parole Board considered both general deterrence and retributive justice prior to 1973, the application of criterion (2) to inmates who committed their crimes before 1973 does not violate the *ex post facto* prohibition of the United States Constitution. The second criterion is *not* disadvantageous to an offender who committed his crime before January 1, 1973, as that criterion merely includes factors which were considered in making parole decisions prior to that date. Thus, under the dictates of *Weaver v. Graham* the 1972 legislation is not *ex post facto* because a critical element of the *Weaver* analysis does not exist; namely,

---

16. Note that the minimum/maximum distinction only applies to indeterminate sentencing as was the case in *Welsh*. Sentences for murder in 1945 were determinate rather than indeterminate and thus under *Welsh* "the adequacy of the

punishment" equaled the length of the sentence, in this case, life. *See* Ill.Rev.Stat. ch. 38, § 801 (1945). We do not believe, however, that *Welsh* is distinguishable upon this ground.

that it be disadvantageous to the affected offender.[17]

Even under the more traditional mode of *ex post facto* analysis it is clear that the retroactive application of the second criterion of Ill.Rev.Stat. ch. 38, § 1003–3–5(c) does not violate the *ex post facto* clause of the Constitution. In *Dobbert v. Florida,* 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977) the Supreme Court, quoting the early decision of *Beazell v. Ohio,* 269 U.S. 167, 46 S.Ct. 68, 70 L.Ed. 216 (1925), delineated the general scope of the *ex post facto* prohibition.

"It is settled, by decisions of this Court so well known that their citation may be dispensed with, that any statute which punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at the time when the act was committed, is prohibited as *ex post facto.*"

*Dobbert,* 432 U.S. at 292, 97 S.Ct. at 2297 (*quoting Beazell,* 269 U.S. at 169–70, 46 S.Ct. at 68–69). Obviously, the only relevant *ex post facto* prohibition in this case is that against statutes which make more burdensome the punishment for a crime after its commission. It should be clear that there is no punishment enhancement in the present case for the same reason that § 1003–3–5(c)(2) was not disadvantageous under the *Weaver* analysis. Since the 1972 legislation merely codified prior Board practice, Heirens' punishment was not increased by the enactment of the second criterion. His opportunity for parole has not been even insignificantly reduced by the delineation in subsection 5(c) of the circumstances which warrant a denial of parole, as those same reasons were applied prior to their incorporation into statute form. Thus, the statute also does not violate the *ex post facto* prohibition of the

Constitution under the more traditional Supreme Court analysis.

As the enactment of § 1003–3–5(c) did not change prior practice, but merely established a framework or structure within which the Board's discretion was to be exercised, the change, if there was any, was only procedural in nature since no substantive rights were affected. Viewing any possible change in this light lends further support for our holding that no *ex post facto* violation occurred in the present case. *See Dobbert v. Florida,* 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977) where the Court held that "[e]ven though it may work to the disadvantage of a defendant, a procedural change is not *ex post facto.*" *Id.* at 293, 97 S.Ct. at 2298. "[T]he constitutional provision was intended to secure substantial personal rights against arbitrary and oppressive legislation, ... and not to limit the legislative control of remedies and modes of procedure which do not affect matters of substance." *Id.* (*quoting Beazell,* 269 U.S. at 171, 46 S.Ct. at 69) (citation omitted). *See also Portley v. Grossman,* 444 U.S. 1311, 100 S.Ct. 714, 62 L.Ed.2d 723 (1980) (Rehnquist, J., opinion in chambers).

■ Before turning to our discussion of the due process issue, one final observation should be made concerning the *Welsh* decision's practical effect on the Parole Board's discretion. Illinois courts have uniformly held that under Illinois law there is no right to parole. *See People v. Nowak,* 387 Ill. 11, 55 N.E.2d 63 (1944); *People v. Ragen,* 400 Ill. 191, 79 N.E.2d 479 (1948); *People v. Spivey,* 10 Ill.2d 586, 141 N.E.2d 321 (1957); *People ex rel. Jones v. Brantley,* 45 Ill.2d 335, 259 N.E.2d 33 (1970); and *People v. Hawkins,* 54 Ill.2d 247, 296 N.E.2d 725 (1973). These cases are not determinative of the question presented in this action, however, since as *Welsh* correctly observed, a prisoner need not "show that he has a vested right to be paroled" to demonstrate an *ex post facto* violation. *Welsh,* 668 F.2d at 332 (*citing Weaver v.*

17. Compare *Prater v. U.S. Parole Commission, Warden, U.S. Penitentiary,* 575 F.Supp. 284 (S.D. Ind.1983) where the district court denied a simi-

lar *ex post facto* claim against the federal Parole Commission on grounds in accord with the present case.

*Graham,* 450 U.S. at 29–30, 101 S.Ct. at 964–965). The problem arises when *Welsh* is read in light of this circuit's subsequent decision in *U.S. ex rel. Scott v. Ill. Parole and Pardon Bd.,* 669 F.2d 1185 (7th Cir. 1982). In *Scott* this court found that the 1972 Illinois parole legislation created a legitimate expectation of parole which was entitled to some measure of constitutional protection. To protect that expectation, the *Scott* court directed the Parole Board to provide parole applicants with a statement of reasons "sufficient to enable a reviewing body to determine whether parole has been denied for an impermissible reason or for no reason at all." *Id.* at 1190 (*quoting United States ex rel. Johnson v. Chairman of New York State Board of Parole,* 500 F.2d 925, 934 (2d Cir.), *vacated as moot,* 419 U.S. 1015, 95 S.Ct. 488, 42 L.Ed.2d 289 (1974)). The *Welsh* case, on the other hand, essentially limits the Illinois Parole Board's discretion to a consideration of special deterrence if the parole applicant was convicted of a crime committed prior to January 1, 1973. Thus, it can be argued that *Welsh,* in light of *Scott,* inferentially created what amounts to a right to parole, a right which the Illinois courts have unequivocally denied existed.

The present case is a perfect example of this presumably unintended result of our holding in *Welsh.* Since in Magistrate Cohn's view, the Parole Board was unable to substantiate through any reference to evidence in the record that Heirens was not in fact rehabilitated and thus was not a good parole risk, the Parole Board had no option and was ultimately ordered to release Heirens. As Magistrate Cohn stated in his December 22, 1982 order: "If the Board, on further reconsideration, should determine that Mr. Heirens is rehabilitated and a good parole risk, then they *must* release him on parole pursuant to the current state of the law." (Emphasis added.)

Thus, the practical outcome of *Welsh* and *Scott* for inmates convicted of crimes committed prior to 1973, is that the Board must be able to point to facts in the record that support its decision that the applicant is not rehabilitated.

As previously noted, there is no set of facts which, if shown, entitle an Illinois inmate to parole under Illinois law as it has been interpreted by its Supreme Court. Subsequent to *Welsh,* however, an argument can be made that if an inmate convicted of a crime committed prior to 1973, no matter how heinous or vicious, maintained a stellar prison conduct record and obtained, for example, a psychiatric report which stated that he was in fact rehabilitated, the Parole Board would apparently be required to grant parole since it would not be able to substantiate in the record either lack of rehabilitation or high parole risk. Clearly, this was not the intention of the Illinois Legislature when it enacted the statutes governing parole. If it had so intended, it certainly would not have granted to the Department of Corrections and subsequently the Parole and Pardon Board such broad discretion limited only by the requirement that such agency give due *consideration* to the inmate's prison record. It should be noted that we are not questioning the result in *Scott,* rather we are simply delineating what we believe to be an additional infirmity of the *Welsh* decision when read in light of our subsequent decision in *Scott.*

**B. THE VALIDITY OF THE PAROLE BOARD'S RATIONALE UNDER DUE PROCESS.**

We now turn to a discussion of whether the rationale provided by the Parole Board met the due process requirements set forth in *U.S. ex rel. Scott v. Ill. Parole and Pardon Bd.,* 669 F.2d 1185 (7th Cir.1982).[18]

---

**18.** The respondents requested that we reconsider our decision in *U.S. ex rel. Scott v. Ill. Parole and Pardon Bd.,* 669 F.2d 1185 (7th Cir.1982). We decline to do so. Amicus asserts that we are required to look to state law when interpreting Illinois' parole statute. *See Greenholtz v. Ne-*

*braska Penal Inmates,* 442 U.S. 1, 12, 99 S.Ct. 2100, 2106, 60 L.Ed.2d 668 (1979); *Bishop v. Wood,* 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976); *Averhart v. Tutsie,* 618 F.2d 479, 481–82 (7th Cir.1980). Amicus contends that there is Illinois case law which in fact

In *Scott,* the court determined that the Illinois parole statute (Ill.Rev.Stat. ch. 38, § 1003–3–5), like the Nebraska statute in *Greenholtz v. Nebraska Penal Inmates,* 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979), "provides [an inmate] with a legitimate expectation of parole entitled to some measure of constitutional protection." *Scott,* 669 F.2d at 1190. Thus, the court held that due process required the Parole Board to provide an applicant whose parole was denied with a statement of reasons which included both the grounds for the denial and the "essential facts" on which those grounds were based:

> "To satisfy minimum due process requirements a statement of reasons should be sufficient to enable a reviewing body to determine whether parole has been denied for an impermissible reason or for no reason at all. For this essential purpose, detailed findings of fact are not required, provided the Board's decision is based upon consideration of all relevant factors and it furnishes to the inmate both the grounds for the decision ... and the essential facts upon which the Board's inferences are based."

*Scott,* 669 F.2d at 1190 (*quoting United States ex rel. Johnson v. Chairman of New York State Board of Parole,* 500 F.2d 925, 934 (2d Cir.), *vacated as moot,* 419 U.S. 1015, 95 S.Ct. 488, 42 L.Ed.2d 289 (1974)). This court has since reaffirmed this standard in *Solomon v. Elsea,* 676 F.2d 282 (7th Cir.1982). To gain a complete understanding of the requirements of due process, however, it is useful to examine *Greenholtz v. Nebraska Penal Inmates,* 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979), the case which formed the basis of our decision in *Scott.*

The Supreme Court in *Greenholtz* began its due process analysis with a general overview of the parole decision-making process.

> "A state may, as Nebraska has, establish a parole system, but it has no duty to do so. Moreover, to insure that the state-created parole system serves the public-interest purposes of rehabilitation and deterrence, the state may be specific or general in defining the conditions for release and the factors that should be considered by the parole authority. It is thus not surprising that there is no prescribed or defined combination of facts which, if shown, would mandate release on parole. Indeed, the very institution of parole is still in an experimental stage. In parole releases, like its siblings probation release and institutional rehabilitation, few certainties exist. In each case, the decision differs from the traditional mold of judicial decisionmaking in that the choice involves a synthesis of record facts and personal observation filtered through the experience of the decisionmaker and leading to a predictive judgment as to what is best both for the individual inmate and for the community. This latter conclusion requires the Board to assess whether, in light of the nature of the crime, the inmate's release will minimize the gravity of the offense, weaken the deterrent impact on others, and undermine respect for the administration of justice. *The entire inquiry is, in a sense, an 'equity' type judgment that cannot always be articulated in traditional findings.*"

442 U.S. at 7–8, 99 S.Ct. at 2103–2104 (footnotes omitted, emphasis added). The Supreme Court subsequently elaborates on this latter point.

> "The parole-release decision, however, is more subtle and depends on an amalgam of elements, some of which are factual but many of which are purely subjective appraisals by the Board members based upon their experience with the difficult and sensitive task of evaluating the

indicates that the Illinois statute does not create an expectation of parole requiring protection under due process as previously held in *Scott.* They cite specifically to *Harris v. Irving,* 90 Ill.App.3d 56, 45 Ill.Dec. 394, 412 N.E.2d 976 (5th Dist.1980), and *People ex rel. Burbank v.*

*Irving,* 108 Ill.App.3d 697, 64 Ill.Dec. 303, 439 N.E.2d 554 (3d Dist.1982). Neither of these cases directly addresses the issue and therefore we will not at this time reconsider our holding in *Scott.*

advisability of parole releases. Unlike the revocation decision, there is no set of facts which, if shown, mandate a decision favorable to the individual. The parole determination, like a prisoner-transfer decision, may be made

'for a variety of reasons and often involve[s] no more than informed predictions as to what would best serve [correctional purposes] or the safety and welfare of the inmate.' *Meachum v. Fano,* 427 U.S. [215] at 225 [96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976) ].''

*Id.* 442 U.S. at 9–10, 99 S.Ct. at 2104–2105 (insertions original). Thus, it is not surprising that the Supreme Court concluded:

"[W]e find nothing in the due process concepts as they have thus far evolved that requires the Parole Board to specify the particular 'evidence' in the inmate's file or at his interview on which it rests the discretionary determination that an inmate is not ready for conditional release. The Board communicates the reason for its denial as a guide to the inmate for his future behavior. See *Franklin v. Shields,* 569 F.2d [784] at 800 [4th Cir. 1977] (en banc). To require the parole authority to provide a summary of the evidence would tend to convert the process into an adversary proceeding and to equate the Board's parole-release determination with a guilt determination. The Nebraska statute contemplates, and experience has shown, that the parole-release decision is, as we noted earlier, essentially an experienced prediction based on a host of variables."

*Id.* at 15–16, 99 S.Ct. at 2107–2108.

■ Thus, the extent of judicial review of the Parole Board's decision is very narrow. If the Parole Board cites to facts upon which its reasons for denial of parole can be justified, due process is met. This position finds support in this court's recent decision in *Walker v. Prisoner Review Bd.,* 694 F.2d 499 (7th Cir.1982) where we held that an enunciation of the various offenses with an indication of the extreme length of

the sentences (indicating the trial judge's determination that the criminal conduct was especially heinous) was sufficient to support the Parole Board's conclusion that parole at that time would deprecate the seriousness of the offense or cause disrespect for the law. *See Walker,* 694 F.2d at 502.

■ With the preceding as a backdrop, we now focus on the question of whether the rationale provided to Heirens fulfilled the requirements of due process. In its first attempt to comply with the Magistrate's July 15, 1982 order, the Parole Board issued the following rationale for its denial of Heirens' parole:

"The Board, having heard your case, reviewed the written material in your file which included a statement from the prosecutor, your institutional record, and the representation made by you at the hearing at Vienna Correctional Center.

"In considering the crimes for which you are now serving time, the Board notes that you were convicted of three murders in which one of the bodies was dismembered. Furthermore, according to the Statement of Facts, you stated that you obtained sexual satisfaction from committing these and other burglaries in which three of the victims were murdered.

"This behavior was precipitated by unknown factors, thus rendering at best your behavior in an unstructured environment difficult to predict.

"The Board in rendering its decision to deny parole considered all the above factors but feels there is a risk of further non-conforming conduct too great to allow your release at this time.

"The foregoing rationale is substantially the same reasoning that led to the denial of your parole in 1979 and other recent years.

"We take note of your excellent institutional adjustment in a structured environment and encourage you to continue in the same manner." [19]

19. Our circuit recently held that a rationale provided by Illinois Prisoner Review Board, similar

As previously stated, the Magistrate, while agreeing that the Board applied the correct "special deterrence" criteria as required by *Welsh*, concluded in his December 22, 1982 order that the Board had in fact failed to explain the discrepancies in its record which inferred, contrary to the preceding rationale, that the Board actually believed Heirens to be rehabilitated and a good parole risk.[20] Rather than releasing Heirens, the Magistrate gave the Board an additional opportunity to provide a rationale which included specific citation to the record to substantiate its determination that Heirens was not rehabilitated and continued to be a poor parole risk.

In response to his December 22 order, the Board issued the following rationale:

"With specific regard to the comments at the hearing in November of 1979, of Mr. James Irving, former Board Chairman, and the fact that Mr. Irving may have expressed an opinion as to your rehabilitation, we would point out that Mr. Irving was speaking as one member, only, and apparently did not feel sufficiently convinced, himself, that you warranted parole according to the Board Order of that date.

"The panel who last interviewed you was likewise not convinced, although you may have demonstrated the ability to perform adequately in a structured society, that you would be able to function without recourse to violence in the free society.

"The Prisoner Review Board heard your particular case at your hearing in August of 1982, considered many and varied factors among which are your personal representations, the many documents in your file, the Program Considerations, your institutional adjustment and the fact that you were sentenced to three consecutive sentences of 'Natural Life' for the offense of murder, together with a vast number of sentences for burglary, robbery and assault with intent to murder.

"Additionally, the record reflects the particularly heinous details of your commission of the kidnapping, murder and subsequent dismemberment of ... an innocent seven-year old child.

"In conclusion, as previously noted during prior parole hearings, your academic achievements have been above average; however, in rendering its decision to deny parole at this time, it is this interviewing panel's opinion that to grant parole would not be in the best interest of society, nor would it serve as a deterrent to non-compliance with the established laws of society."

Upon review of the foregoing rationale, we hold that the Board's statements met the due process requirements as set forth in *Scott* and *Greenholtz*. Further, we hold that the Magistrate erred in attempting to force the Parole Board to go beyond the requirements of *Greenholtz* by requiring that it in effect "provide a summary of evidence" in contravention of the Supreme Court's ruling. *See Greenholtz*, 442 U.S. at 15, 99 S.Ct. at 2107.

The Board provided Heirens with two reasons for its decision to deny parole: (1) that the risk of non-conforming conduct was too great, i.e., doubts regarding his

in many respects to the above-noted rationale, was adequate under the dictates of *Welsh*. *Sayles v. Welborn*, 725 F.2d 436 (7th Cir.1984). Ironically, Magistrate Cohn was also involved in that case and likewise found the rationale provided therein sufficient to satisfy *Welsh*. Note that the present decision to overrule *Welsh* will not change the result in *Sayles* since special deterrence remains one of the valid grounds upon which to deny parole.

20. A major part of the evidence the Magistrate relied upon for his conclusion that the Board viewed Heirens as rehabilitated came from statements made by Board Chairman Irving at Heirens' November 1979 parole hearing. It should be noted that this was one man's view, and as clearly made evident in the Board's rationale following the Magistrate's December 12, 1982 order, Irving's opinion was not that of a majority of the Board. Furthermore, the Board as a whole has never stated that they believe Heirens to be rehabilitated and a good parole risk.

rehabilitation;[21] and (2) that release would not serve the best interests of society nor "serve as a deterrent to non-compliance with the established laws of society" (now a viable reason due to our reversal of *Welsh*). The facts cited to support the Board's fear that Heirens might resort to violence in an unstructured environment are: (1) three murders, one of which was particularly heinous and gruesome; (2) that he stated he obtained sexual satisfaction from committing the murders and other burglaries; and (3) that his behavior was caused by unknown factors making conduct in an "unstructured" setting difficult to predict. The facts cited to support the Board's belief that release would not be in society's best interest nor serve as a deterrent for other would-be offenders are: (1) the number of offenses—three murders and the "vast" number (26) of other crimes; and (2) the "particularly heinous details" of one of the murders. Furthermore, the second rationale also addressed the evidence which so concerned the Magistrate, that is, it indicated that Mr. Irving's statements were his own and did not represent the beliefs of the other members of the reviewing panel which considered Heirens' parole in 1979. We hold that the above-noted reasons and supporting evidence meet the due process requirements of *Scott.* The Board considered all the relevant factors, provided Heirens with its reasons for denial and also gave him the "essential facts" underlying its reasons. Nothing more is required. *Accord Walker v. Prisoner Review Bd.*, 694 F.2d 499 (7th Cir.1982).

For the foregoing reasons, we reverse the determination of the Magistrate and deny the petition for a writ of habeas corpus.

---

21. It is not surprising that Parole Boards more closely scrutinize the degree of rehabilitation of parole applicants convicted of assaultive crimes as compared with applicants convicted of property crimes. If the property offender repeats his crime on parole the likelihood that human life will be harmed is much less than if an offender who has already shown his tendency to engage in assaultive behavior repeats his crime. *See* Dawson, *The Decision to Grant or Deny Parole: A Study of Parole Criteria in Law and Practice,* 1966 Wash.U.L.Q. 243, 249–50.