2 Ill. App.3d 1026 (1971)
279 N.E.2d 23
THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee,
v.
CLARENCE W. WALKER, Defendant-Appellant.
No. 54138.
Illinois Appellate Court  First District.
November 17, 1971.
*1027 *1028 Gerald W. Getty, Public Defender, of Chicago, (George L. Lincoln and James J. Doherty, Assistant Public Defenders, of counsel,) for appellant.
*1029 Edward V. Hanrahan, State's Attorney, of Chicago, (Robert A. Novelle and Michael J. Goldstein, Assistant State's Attorneys, of counsel,) for the People.
Judgment affirmed.
Mr. PRESIDING JUSTICE ADESKO delivered the opinion of the court:
Defendant, Clarence W. Walker, was charged with the crimes of rape, armed robbery, and attempt murder. He was convicted of each offense in a bench trial and was sentenced to serve consecutive terms of 100 to 150 years for rape, 100 to 150 years for armed robbery, and 19 to 20 years for attempt murder. Defendant appeals his convictions and presents the following issues for our review.
"(1) Whether the State withheld evidence favorable to the accused;
(2) Whether the State introduced statements in violation of defendant's Fifth Amendment rights;
(3) Whether the State obtained evidence by an illegal search and seizure;
(4) Whether the defendant received effective assistance of counsel; and
(5) Whether the defendant could lawfully be required to serve consecutive sentences."
The evidence in this case indicates that on the morning of July 1, 1966, the complaining witness, Mrs. Lora Gibson, was at Chicago Police Headquarters to file a complaint against her estranged husband. When Mrs. Gibson was informed that she would have to file her action at a district police station, located on the south side of Chicago, the defendant approached her, accompanied by Vanessa Harper, and offered to drive her to the south side. Mrs. Gibson accepted and after dropping off Vanessa Harper, the defendant continued with Mrs. Gibson to the south side station but was unable to find a judge there. The defendant then told Mrs. Gibson that he knew a judge in Skokie, Illinois and volunteered to drive her there so that she could get the warrant for the arrest of her husband. Mrs. Gibson agreed to make the trip.
Once they had entered the suburbs, however, the defendant drove to a forest preserve area and pulled off the road. The complainant testified that defendant told her to get out of the car, grabbed her wrist, pulled her from the vehicle and dragged her into the woods. Placing his arm around the complainant's neck and his hand over her mouth, defendant told Mrs. Gibson that he was a maniac. Defendant then pulled off Mrs. Gibson's skirt and undergarments and forced her to submit to an act of sexual intercourse, threatening to kill her, "* * * and to leave (her) body out there to rot * * *" if she did not obey.
*1030 Mrs. Gibson further testified that after completing the act of intercourse, the defendant kicked her and struck her on the side of the head with a Coca Cola bottle, knocking her unconscious. When she regained consciousness, the defendant was raping her again. When he had finished, he took a razor blade and slit the complainant's throat from ear to ear. He also slashed her abdomen with the blade. The defendant then pulled off a ring from the complainant's finger and pulled her watch from her wrist. Defendant took these articles along with a ten-dollar bill from the complainant's shoe and left the scene.
After crawling through the woods for three days and two nights, Mrs. Gibson was finally found beside a road adjacent to the wooded area, by Officer James Dutton of the Hoffman Estates Police Department. Mrs. Gibson was hospitalized and recovered from her wounds.
On September 20, 1966, the complainant was walking on the south side of Chicago when she noticed the defendant crossing a street. The complainant recognized him as her assailant and summoned the police who arrested the defendant.
Lora Gibson's testimony concerning her injuries was corroborated by the medical evidence of two physicians who testified that her neck and windpipe had been cut and that she had multiple lacerations about the face, neck, abdomen and lower legs as well as a laceration of the vagina which would have to have been made by an entry into the vagina.
Vannessa Harper testified that on the date in question the defendant met Mrs. Gibson at Police Headquarters. The three then drove to the south side where the defendant dropped Vanessa Harper off and proceeded on alone with Mrs. Gibson.
The arresting officers, Breckenridge, Lett and Jones, each testified that during questioning, the defendant denied any knowledge of the complainant. He also denied driving the auto which the complainant described. When he was told that the complainant had identified him as her assailant, however, the defendant admitted meeting Mrs. Gibson and he also admitted possessing an auto of the type described by the complainant.
In support of an alibi defense, defendant's wife testified she was with the defendant in Toledo, Ohio from June 29th to July 5th. She also testified that she and defendant were stopped by an Officer Hunt for a traffic offense in Toledo, Ohio and that she knew Officer Hunt personally.
Defendant testified on his own behalf that he and his wife had been in Toledo, Ohio during the time Mrs. Gibson had been attacked. He related, however, that his wife had lied about the date that the police officer had stopped them, stating that the incident occurred on July 2nd or 3rd.
*1031 The State in rebuttal introduced a Cook County Hospital referral slip which established that on July 3rd, when defendant's wife was supposedly in Ohio with the defendant, she was in fact receiving treatment in Chicago. The State also presented Officer Charles Hunt of the Toledo Police Department who stated that he did not know either the defendant or his wife; that he did not recall ever stopping them for a traffic violation and that he could find no record of such an incident in either his files or those of the Toledo Police Department.
 1 Defendant's first contention on appeal is that he was improperly denied access to a police report containing complainant's initial statement to the police. It appears the complainant had initially given a different account of how she had come to be with the defendant in his auto than what she later testified to and the defense desired this for impeachment purposes. The defense is entitled to the production of substantially verbatim statements by witnesses for impeachment purposes where no privilege exists and where the relevancy and competency of a statement or report has been established. (People v. Wolff, 19 Ill.2d 318.) This rule includes use of statements by witnesses as recorded in police reports People v. Moses, 11 Ill.2d 84; People v. Green, (Ill. App.), 272 N.E.2d 721.
 2 The State argued here that they were not bound to produce any such statement as the defense had failed to prove that the police had even written down complainant's statement, let alone that it was a substantially verbatim account. An examination of the record, however, reveals that at trial the State never denied the existence of such a statement, arguing only that such statements were not verbatim. This court has held that it is not the purview of the prosecutor to determine whether or not a statement is substantially verbatim, but rather it is the province of the court. People v. Williams, 72 Ill. App.2d 96; People v. Beard, 67 Ill. App.2d 83.
In People v. Marshall, 112 Ill. App.2d 426, this court expressed the rule that when the State asserts that a statement is not substantially verbatim, the trial court should not accept his assertion without inspecting the document. The court said at page 429:
"The trial judge denied the production of the requested statement solely upon the State's representation to him in an adversary proceeding that what was sought was merely a summary sheet * * *. In view of the fact that the trial judge never viewed the purported summary sheet and in view of the fact that the statement does not appear in the record before us, we find it impossible to blindly accept such a premise. * * * When an accused for impeachment purposes demands production of a witness' statement in the possession of the *1032 People and when the prosecution claims the statement is privileged, irrelevant or incompetent, the trial court is to examine the statement to determine if such claims are justified. [Citing cases.]"
 3 In the instant case, the trial court should have examined the police report to determine that it did not contain a substantially verbatim recital of the complainant's testimony before it could deny defendant's access to it. However, like Marshall, upon a review of the record, we fail to see how the aforementioned error prejudiced the defendant even if the statement had been verbatim. In the case at bar, the complainant on direct examination by the State fully admitted what she initially told the police, and that her initial story concerning how she met the defendant varied from her later testimony. The trier of fact was thus fully apprised of any inconsistency in the witness' testimony and the lack of a statement of her testimony for impeachment purposes could thus not prejudice the defendant.
Defendant next contends that the State violated his Fifth Amendment rights by improperly introducing evidence in violation of the United States Supreme Court's decision in Miranda v. Arizona, 384 U.S. 436. Defendant maintains that he received insufficient warning of his rights at his initial interrogation and that he was improperly questioned after indicating his desire to remain silent.
The evidence indicates that after his arrest by Chicago policemen, defendant said that he could read English and was directed to read a poster containing his civil rights. These rights were then read aloud to the defendant and it was further explained that he could remain mute if he so chose, but that if he spoke, what he said would be used against him in court; that he didn't have to make any statement one way or the other without counsel, and if he didn't have counsel or could not afford an attorney, one would be provided for him. The defendant responded "I know that." Defendant was then told of the accusation the complainant had made against him and was asked what he had to say about it. The defendant replied, "I have nothing to say about it. I do not know the lady. I have never seen her before." He was then asked about the car complainant described her assailant as driving and defendant replied that he didn't own such a car. A short time after answering those questions for the Chicago Police, defendant was interrogated again by a Cook County Sheriff's policeman, who again warned the defendant of his rights. During questioning, defendant admitted having seen the complainant on the day of the crime and admitted owning the type of car used in the crime.
 4 Defendant contends that the first set of warnings he received from the Chicago policemen was defective as not being in the precise language *1033 of Miranda. Defendant concedes the second warnings from the Sheriff's policeman were perfect, but contends that allowing evidence of his first testimony even though it was exculpatory prejudices him by demonstrating a disparity in his answers which adversely affects his credibility. Miranda requires that a suspect be warned of his right to remain silent. 384 U.S. at page 467; that anything said can be used against him, 384 U.S. at page 469; and that he has the right to consult an attorney, to have an attorney present during interrogation, and to have an attorney appointed if he cannot afford one. (384 U.S. 471, 473.) However, the words of Miranda do not constitute a ritualistic formula which must be uttered without deviation to be effective. Rather words which convey the substance of the warnings and the required information are sufficient. (People v. Landgham, 122 Ill. App.2d 9; United States v. Vanterpool, 394 F.2d 697, 8, 9 (2d Cir.).) In People v. Bosveld, 109 Ill. App.2d 317, this court quoted approvingly from Coyote v. United States, 380 F.2d 305, 308 (10th Cir.):
"Surely Miranda is not a ritual of words to be recited by rote according to didactic niceties. What Miranda does require is meaningful advice to the unlettered and unlearned in language which he can comprehend and on which he can knowingly act. We will not indulge semantical debates between counsel over the particular words used to inform an individual of his rights. The crucial test is whether the words in the context used, considering the age, background and intelligence of the individual being interrogated, impart a clear, understandable warning of all his rights."
 5 Upon careful examination of the complete record, we find that the warnings given to defendant were adequate to inform him of his rights and that he knowingly waived those rights before speaking.
 6 Defendant also asks that we find this interrogation improperly continued after he had indicated a refusal to answer any questions. Defendant contends that his response to the inquiry as to what he had to say about the incident, "I have nothing to say about it", indicated a desire to terminate all questioning. The record does not support this contention. Defendant's language was merely an answer to a question posed. Defendant, with no further questions being asked then volunteered that he didn't know the complainant and that he had never seen her before. He continued to respond to questions when they were asked and in no way manifested any desire to terminate the questioning. We therefore find that the State did not deny defendant his rights by continuing to question him after he indicated a desire to answer no more questions.
 7, 8 The defendant's third contention on appeal is that the Cook County Hospital referral slip introduced to impeach his alibi witness was the product of an illegal search and seizure and deprived him of this *1034 Fourth Amendment rights. We find it unnecessary to decide the validity of the search as the evidence is clear that the referral slip was not the property of the defendant, nor did the vehicle the slip was found in belong to the defendant. Fourth Amendment rights are personal in nature and cannot be vicariously asserted. (Simmons v. United States, 390 U.S. 377; Jones v. United States, 362 U.S. 257.) In Alderman v. United States, 394 U.S. 165, the United States Supreme Court held at page 173:
"The rule is '* * * to qualify as a "person aggrieved by an unlawful search and seizure" one must have been a victim of a search or seizure, one against whom the search was directed, as distinguished from one who claims prejudice only through the use of evidence gathered as a consequence of a search or seizure directed at someone else * * *.
`Ordinarily, then, it is entirely proper to require of one who seeks to challenge the legality of a search as the basis for suppressing relevant evidence that he allege, and if the allegation be disputed that he establish, that he himself was the victim of an invasion of privacy.'"
In the instant case, defendant cannot establish that he was the victim of an illegal search and his claim of error in admitting the referral slip must be dismissed.
 9 Defendant next contends that he was denied effective assistance of counsel. To warrant a reversal because of the incompetence of court appointed counsel, it must clearly appear not only that counsel performed his trial duties in an incompetent manner, but also that defendant was prejudiced thereby. People v. Bernatowicz, 35 Ill.2d 192; People v. Yarbrough, 97 Ill. App.2d 457.
 10 Defendant on appeal criticizes his attorney's failure to move to suppress either defendant's statements to the police or the hospital referral slip. But, as we have already determined, neither the statements nor the referral slip were obtained in derogation of any of the defendant's constitutional rights. Thus counsel's failure to move to suppress did not prejudice the defendant.
 11-13 Defendant further contends that defense counsel impeached his own witness when on direct examination he elicited from an alibi witness information concerning her prior convictions for non-infamous crimes. This could have been an intentional trial tactic to demonstrate the absolute candor of his alibi witness. Similarly, the few other instances of incompetence alleged by defendant could be explained as reasonable trial tactics. It is well settled that appellate review of trial counsel's competence does not extend to those areas involving the exercise of judgment, discretion, or trial tactics. (People v. Martin, 44 Ill.2d 489; People v. Wesley, *1035 30 Ill.2d 131.) We therefore find that defendant has failed to demonstrate any incompetence by his trial counsel.
 14, 15 Defendant's final contention, on appeal, is that he cannot lawfully be required to serve consecutive sentences for his crimes as they arose out of a single transaction. Defendant's contention is without merit. The evidence at trial demonstrated that after threatening complainant with death, the defendant raped her twice, then produced a razor blade and slit the complainant's throat and abdomen. When this brutal act was over, defendant proceeded to take complainant's money, ring and wrist watch and left. We find that the conduct in the instant case was not a single transaction but three separate acts. While we recognize that the acts of defendant were not wholly unrelated, nonetheless, the three offenses, involving three distinct mental states did not result from the same "conduct" as that term is defined and used in sections 2-4 and 1-7(m) of the Criminal Code. (Ill. Rev. Stat. 1967, ch. 38, pars. 2-4 and 1-7.) (See People v. Bridges, 123 Ill. App.2d 58.) Where two or more offenses arise from separate though closely related acts, separate sentences, either consecutive or concurrent, are permitted. (Ill. Rev. Stat. 1967, ch. 38, par. 1-7(m)); People v. Raby, 40 Ill.2d 392.) In the case at bar the court sentenced defendant to serve consecutive terms and it is clear from the record that the court intended each sentence to be served in the order announced.
For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.
Judgment affirmed.
BURMAN and DIERINGER, JJ., concur.