**UNITED STATES of America ex rel. Clarence WALKER, Petitioner,**

v.

**Michael O'LEARY, Warden, Respondent.**

No. 88 C 7367.

United States District Court, N.D. Illinois, E.D.

Dec. 18, 1989.

Clarence Walker, pro se.

Terence Madsen, Asst. Atty. Gen., Crim. Appeals Div., William P. Pistorius, Chicago, Ill., for defendant.

## MEMORANDUM AND ORDER

MORAN, District Judge.

Petitioner Clarence Walker ("Walker"), an inmate in the Stateville Correctional Center, filed a *pro se* petition for a writ of *habeas corpus* based on various constitutional infirmities allegedly attending the calculation of his sentence, his good-time credits and his eligibility for parole. Before this court is a motion for summary judgment filed by respondent Michael O'Leary ("O'Leary"), the warden at Stateville, and a cross-motion filed by Walker. For the reasons set forth below, Walker's motion is denied, and O'Leary's motion is granted in part.

### FACTS

Walker was arrested on September 20, 1966 and convicted in a March 3, 1968 bench trial of rape, armed robbery, and attempted murder, for which he was sentenced to consecutive terms of 100 to 150 years, 100 to 150 years, and 19 to 20 years, respectively. Following an unsuccessful

direct appeal, *People v. Walker,* 2 Ill. App.3d 1026, 279 N.E.2d 23 (1971), and a denial of his petition for leave to appeal to the Illinois Supreme Court, Walker petitioned for post-conviction relief, and the judgment of the Cook County Circuit Court dismissing this petition was affirmed at the appellate level, *People v. Walker,* 6 Ill. App.3d 909, 286 N.E.2d 812 (1972). Leave to appeal to the Illinois Supreme Court was again denied on March 29, 1972. Walker's final attempt at direct review, a petition for a writ of *certiorari,* was denied by the United States Supreme Court on February 20, 1973. *Walker v. Illinois,* 410 U.S. 941, 93 S.Ct. 1377, 35 L.Ed.2d 608 (1973).

After serving approximately twenty years of his sentence, Walker filed a petition for a writ of *mandamus,* alleging many of the same constitutional violations that are now at issue. Specifically, Walker argued that the Illinois Department of Corrections ("the Department") had unconstitutionally denied him good-time credits for the period that he had served prior to his conviction; that the Department had improperly neglected to apply prospectively the 1978 change in the good-time credit system, allowing for day-to-day good-time credits, and that it had failed to apply both that system and a 1973 good-time credit enactment retrospectively; that it had failed to recalculate his sentence pursuant to the Uniform Corrections Code even though his case had not reached final adjudication as of January 1, 1973, the effective date of the Code; and finally, that it had incorrectly determined his parole eligibility date. The Circuit Court ruled against Walker on all claims at the summary judgment stage, and this judgment was upheld in a cursory opinion by the Illinois Appellate Court. *Walker v. Lane,* 165 Ill.App.3d 1165, 129 Ill.Dec. 971, 536 N.E.2d 1021 (1987). Walker's petition for leave to appeal to the Illinois Supreme Court was denied for a third time. Walker now seeks from this court a writ of *habeas corpus* based on the constitutional claims asserted at the *mandamus* level and on the additional argument that parole criteria enacted subsequent to the commission of Walker's criminal act were used to determine his eligibility in violation of the Constitution's prohibition of *ex post facto* laws.

## DISCUSSION

### A. *Good–Time Credits*

At the time that Walker committed the criminal acts from which this action stems, in 1966, good-time credits in Illinois were applied to the minimum and maximum terms of indeterminate sentences according to the "statutory" good-time credit system: pursuant to a general good-time credit statute, the Department of Corrections established a system whereby a prisoner could receive one month of good-time credit for his first year of imprisonment, two months the second year, and similar increases until his sixth year, after which he could receive six months annually. Supplementing this system, a "compensatory" good-credit scheme was established pursuant to new statutory authority effective January 1, 1973, Ill.Rev.Stat. ch. 38, ¶ 1003–12–5 (1973); under this system, a prisoner could now receive, in addition to the statutory credits, 7½ days per month for performing work assignments. *See generally Johnson v. Franzen,* 77 Ill.2d 513, 34 Ill.Dec. 153, 397 N.E.2d 825 (1979); *Barksdale v. Franzen,* 700 F.2d 1138 (7th Cir.1983).

In 1977, the Illinois legislature amended these authorizing statutes and divested the Department of Corrections of its discretion to establish statutory and compensatory good-time credit rates. Ill.Rev.Stat. ch. 38, ¶¶ 1003–6–3, 1003–12–5 (1979). The amendments, effective February 1, 1978, specifically direct the Department to prescribe

> rules and regulations [that] ... provide that the prisoner shall receive one day of good conduct credit for each day of service in prison for all classes of felonies other than where a sentence of "natural life" has been imposed. Each day of good conduct credit shall reduce by one day the inmate's period of incarceration set by the court.

Ill.Rev.Stat. ch. 38, ¶ 1003–6–3(a)(2) (1979). *See generally Johnson,* 77 Ill.2d at 516–17, 34 Ill.Dec. at 154–55, 397 N.E.2d at 826–27. Compensatory credits were abandoned en-

tirely in favor of a system providing only for monetary compensation to inmates for services performed. The "day-for-day" formula, still in effect, is applied to all prisoners sentenced after its effective date and to prisoners sentenced prior to this date for subsequently served time. *See id.; Williams v. Irving*, 98 Ill.App.3d 323, 53 Ill.Dec. 746, 424 N.E.2d 381 (1981). For each prisoner sentenced before February 1, 1978, however, the effects of the day-for-day formula on that individual are compared to the effects of the statutory and compensatory system, and to the extent application of the day-for-day system would result in a later final release date, the old system is used to calculate post–1978 credits. *Barksdale*, 700 F.2d at 1140.[1] Indeed, to do otherwise—to apply the new system to the detriment of veteran prisoners—may violate the *ex post facto* clause of the U.S. Constitution. *Mosley v. Moran*, 798 F.2d 182, 184 (7th Cir.1986); *Barksdale*, 700 F.2d at 1140 n. 2; *cf. Weaver v. Graham*, 450 U.S. 24, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981) (finding a new law that changed the availability of good-time credit to violate the *ex post facto* clause). Walker asserts two constitutional claims related to this good-time statutory structure: first, that he is entitled to application of the 1978 system for time served after its effective date and, second, that he is entitled to retroactive application of the statutory changes, including credits for time served prior to 1973. We consider these claims in order, looking first to whether any error in calculating Walker's good-time credits has occurred and, second, if one has, to whether it rises to the level of constitutional error.

### 1. Post–1978 Application of the Day-to-day Formula

■ After an initial struggle with the good-time credit and sentence calculation

worksheets, provided to this court without explanation or clarification by O'Leary,[2] we were able to ascertain to our satisfaction that Walker's post–1978 good-time credits are calculated according to the old statutory and compensatory systems. Walker's allegation that he was unconstitutionally denied application of the day-for-day credit formula since February 1, 1978, implies an argument that the post–1978 system would benefit him more than the statutory and compensatory schemes. In response, O'Leary observes that the "Illinois Appellate Court has already determined that petitioner has received all of the good-time credit that he is entitled to under Illinois law" and goes on to assert—again relying on the Appellate Court's opinion—that Walker "has benefitted more from the credit formula now being applied than he would be receiving under alternative statutory formulas." The Appellate Court, however, offers no further proof or reasoning than "[t]he record indicates that [the 1973] credit formula was more beneficial to the petitioner than either the pre–1973 system or the day-for-day system introduced in 1978."

Were it universally true that the day-for-day system is less beneficial than the earlier system, or were this fact only specifically true with respect to Walker but easily gleaned from the record, O'Leary's naked assertion might be sufficient. But past cases clearly establish that the question of which system is more beneficial is a prisoner-specific inquiry, *see Barksdale*, 700 F.2d at 1140 ("for *some* prioners, application of the new day-to-day formula resulted in a longer period of incarceration" (emphasis added)); *Williams*, 98 Ill.App.3d at 326, 53 Ill.Dec. 749, 424 N.E.2d at 384; indeed, in *Johnson*, application of the day-to-day formula resulted in a shorter sentence. 77 Ill.2d at 518, 34 Ill.Dec. at 155, 397 N.E.2d at 827. Moreover, the procedure used to

---

**1.** Thus, to this day, the old system continues to be applied in some cases even though the 1978 amendments "no longer give[ ] the Department authority to award compensatory good-conduct credits ... [or] statutory good-time credit at a discretionary rate...." *Johnson*, 77 Ill.2d at 516, 34 Ill.Dec. at 154, 397 N.E.2d at 826.

**2.** These worksheets, some of which were so poorly reproduced that complete lines and numbers are missing, were accompanied by a letter from the Record Office Supervisor stating simply that "[t]he attached document demonstrates that Clarence Walker ... has received credit for time served from September 1966."

credit a prisoner's sentence with his good-time awards is far from intuitive.[3] And the method established to calculate and compare the effects of the two systems is similarly complex. *See Williams,* 98 Ill. App.3d at 325–26, 53 Ill.Dec. at 748, 424 N.E.2d at 383. O'Leary's motion for summary judgment, therefore, should have been accompanied by an affidavit verifying its assertion that the pre–1978 system was more advantageous to Walker and explaining how this result was reached.[4]

Rather than delay the adjudication of this claim, however, this court has undertaken the task of calculating the effects of the two systems itself. We find that under the day-for-day system, Walker is scheduled for final release in approximately January, 2134, compared with his projected release date under the old system of March 31, 2124 as of December, 1988.[5] The Department of Correction's refusal to apply the day-for-day formula to Walker's sentence is consistent with Illinois law and constitutes no error; Walker's allegation that the Department's conduct violates the Due Process Clause of the Fourteenth Amendment is consequently untenable.

■ We pause here briefly to analyze in greater detail Walker's argument that non-application of the day-for-day system violates the *ex post facto* clause. Our finding that use of the day-for-day formula with respect to Walker's sentence would push back his final release date and therefore work to his detriment compels the conclusion that no *ex post facto* violation occurred; quite the contrary, application of the new system would be constitutionally suspect. We also note, however, that Walker's argument reflects a fundamental misunderstanding of the purpose of the *ex post facto* clause and of what triggers a violation. Walker claims that non-application of a subsequently enacted statute that may benefit him runs afoul of the *ex post facto* clause. But the protection afforded by this clause is much more limited than Walker seems to think: it forbids the enactment of any law " 'which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed.' " *Weaver v. Graham,* 450 U.S. 24, 28, 101 S.Ct. 960, 964, 67 L.Ed.2d 17 (1981) (citing *Cummings v. Missouri,* 4 Wall. 277, 325–26, 18 L.Ed. 356 (1867)). The effect of the prohibition on *ex post facto* laws is to ensure that the punishment assigned by law at the time the act occurred will be the ceiling on punishment; it simply is not meant to reach any law that may reduce the punishment below that ceiling. For the purposes of *ex post facto* analysis, then, a court is concerned not with whether a new law that may benefit a prisoner is *not* applied but rather with whether a new law that might hurt him *is.*

3. Rather than apply the credits to a sentence as the credits are earned, the Department of Corrections subtracts these credits from the minimum and maximum sentences in one lump sum at the outset of a prisoner's incarceration. And the lump sum is determined by multiplying six months times the *total* number of years of the original sentence (minus fifteen months corresponding to the first five years of the sentence during which the prisoner is working up to the six-month a year level.) Thus a prisoner sentenced to a maximum of 20 years will have 8 years and 9 months subtracted from his sentence when he first begins serving time, and he would be entitled to final release after serving only 11 years and 3 months of his sentence. This system of calculation therefore has the anomalous result of advancing a prisoner's release date with hypothetical credits "earned" after the prisoner is released.

Even having cracked this code, we do not completely understand how the statutory good-time credits were calculated with respect to Walker's maximum sentence. His 320 years maximum term was reduced by 161 years and 3 months; under the system of calculation as we understand it, he would be entitled to 158 years and 9 months of statutory credits. This discrepancy, however, has no impact on the question of which system is more beneficial to Walker; using either figure, the same result obtains.

4. In *Barksdale,* for example, the defendant submitted an affidavit specifying how each system would affect the prisoner's sentence. 700 F.2d at 1141. O'Leary should do the same in the future.

5. The release date under the compensatory and statutory system is subject to further advancing as Walker earns additional compensatory credits; although the statutory credits are applied to the sentence at once at the beginning of the prisoner's term, compensatory credits are applied as they are earned.

Walker's allegation is therefore misguided.[6]

### 2. Retroactive Application of Changes in Good-time Credit Laws.

■ Walker was first imprisoned on September 20, 1966, the date of his arrest, and has served continuously since that date. The statutory good-time credit system, in effect when Walker committed his crimes, was applied from the outset of his incarceration.[7] The 1973 good-time credit enactment, instituting the 7½–day per month compensatory scheme, was applied to Walker's sentence from 1973 to the present, and the 1978 day-for-day formula was never applied. Walker argues that both changes should have been retroactively applied to his sentence clear back to the beginning of his imprisonment in 1966. O'Leary offers no response specifically directed at this issue but instead seems to lump it together with the post–1978 argument by asserting merely that "the Department has given petitioner full credit for all of the time to which he is entitled." Respondent's Reply at 3.

Though insufficiently reasoned, O'Leary's position is correct. The precise question of the retroactive application of the 1978 day-for-day statute was considered by the Illinois Supreme Court in *Johnson v. Franzen*. In rejecting that proposition, the court observed:

> [T]here is no clear statutory indication that the day-for-day formula applies retroactively to time spent in custody before the effective date of the amended

system. ... Absent such a clear legislative intention ... we will not hold that the day-for-day formula applies to time served prior to February 1, 1978.

77 Ill.2d at 521–22, 34 Ill.Dec. at 157, 7 N.E.2d at 829; *see also Mosley*, 798 F.2d at 186 ("statutes that went into effect subsequent to the commission of the crime will not be applied retroactively unless there is statutory language clearly to that effect."). Similarly, ¶ 1003–12–5 of the 1973 Unified Corrections Code, the statutory authority for compensatory credits, lacks any indication that the legislature intended it to be applied retroactively:

> Persons performing a work assignment ... shall receive wages or good conduct credit ... or both.... In determining rates of compensation, the Department shall consider the effort, skill and economic value of the work performed. Compensation or good conduct credit may be given to persons who participate in other programs of the Department. All wages shall be deposited in the individual's account under rules and regulations of the Department.

Ill.Rev.Stat. ch. 38, ¶ 1003–12–5 (1973). Moreover, when one considers the purpose of compensatory credits—to reward prisoners not for time served but rather for services performed—retroactive application seems inapposite. We find that Walker was entitled only to statutory good-time credits, which he received, for time served prior to 1973, and therefore the Department of Corrections did not err in refusing

---

**6.** Walker brings his mistaken approach to *ex post facto* analysis to bear on several other of his constitutional claims: he alleges *ex post facto* violations in the Department's failure retroactively to apply 1) changes in the good-time credit system, 2) a 1973 sentencing provision, and 3) a 1978 law permitting prisoners to elect a fixed release date. These *ex post facto* arguments fail for the reason explained in the text. The remaining constitutional merits of these claims will be considered *infra*. So too will Walker's one valid *ex post facto* claim—that subsequently enacted parole eligibility criteria were used to his detriment.

**7.** The appellate court in the *mandamus* proceeding asserted that Walker "received no credits prior to 1973." However, his sentence calcula-

tion worksheet suggests that this statement is not accurate. The Department of Corrections subtracted 161 years and 3 months, which corresponds—roughly—to Walker's maximum sentence less statutory good time, from *September 9, 1966,* Walker's initial date of imprisonment, to determine his final discharge date of December 20, 2127. Similarly, the Department subtracted 11 years and 3 months, which corresponds to 20 years (at which point the Unified Corrections Code requires that every prisoner first be considered for parole, *see* Ill.Rev.Stat. ch. 38, ¶ 1003–3–3(a)(1) (1987)) less statutory good time, from *September 9, 1966,* to determine his parole eligibility date. He was thus awarded statutory good-time credits from the very beginning of his confinement.

retroactively to apply subsequently enacted laws.

### B. *Recalculation of Sentence*

■ Walker's next line of argument contests the Department's failure to apply to him the benefits of a 1973 amendment to the Unified Corrections Code's sentencing provisions. He maintains that his sentence should have been recalculated in accordance to Ill.Ann.Stat. ch. 38, ¶ 1005–8–4(c) (Smith Hurd 1973), which provides in relevant part:

> The aggregate maximum of consecutive sentence shall not exceed twice the maximum term authorized under Section 5–8–1 for the most serious felony involved. The aggregate minimum period of consecutive sentences shall not exceed twice the lowest minimum term authorized under Section 5–8–1 for the most serious felony involved.

The applicability of this provision is limited by Ill.Rev.Stat. ch. 38, ¶ 1008–2–4 (1987) to the prosecution of violations occurring after January 1, 1973, except

[i]f the offense being prosecuted has not reached the sentencing stage or a final adjudication by January 1, 1973, then for purposes of sentencing the sentences under the Unified Code of Corrections apply if they are less than under the prior law upon which the prosecution was commenced.

¶ 1008–2–4(a). Walker received consecutive sentences of 100–150 years, 100–150 years, and 19–20 years, and these were added together to create an aggregated sentence of 219–320 years. This sum was not recalculated in accordance with the prescripts of the 1973 statute,[8] and O'Leary disavows its applicability, arguing that Walker's case had reached final adjudication before January 1, 1973.

While the Illinois state judicial system had completed its review of Walker's case before January 1, 1973, his petition before the U.S. Supreme Court for a writ of *certiorari* was not denied until February 20, 1973.[9] To fall within the purview of ¶ 1005–8–4(c), a case must not have reached *final adjudication* by its effective date.

---

**8.** It is not clear whether recalculation would have reduced Walker's sentence. Under the 1973 Unified Corrections Code, rape and armed robbery were class 1 felonies, and attempted murder, though not specifically classified, was punishable as a class 1 felony. Ill.Rev.Stat. ch. 38, ¶¶ 11–1(c), 18–2(b), 8–4(c)(1) (1973). The maximum term for a class 1 felony was "any term in excess of 4 years" and the minimum term was "4 years unless the court, having regard to the nature and circumstances of the offense and the history and character of the defendant, sets a higher minimum term." Ill. Rev.Stat. ch. 38, ¶ 1005–8–1(b)(2), (c)(2) (1973). There is therefore no absolute floor or ceiling. We do not need to determine here, however, what effect, if any, the new statute would have on Walker's sentence; the combined mandate of ¶¶ 1005–8–4(c) and 1008–2–4(a) is to recalculate the sentence of every prisoner whose adjudication was not final on January 1, 1973. Of course a recalculation that serves to increase a prisoner's sentence might violate the *ex post facto* clause, but the sentence must first be recalculated to determine what effect the statutory change has on the sentence. That Walker's sentence might not have been reduced therefore does not cure a constitutional defect that otherwise exists. Moreover, although the 1973 statute does not set a ceiling on the maximum term, it does limit the maximum aggregate sentence to twice the maximum for the most serious felony involved. We think it unlikely that a recalcula-

tion would *increase* Walker's sentence for rape or robbery, and thus the aggregate sum would likely be less than 320 years.

Walker mistakenly argues that the ¶ 1005–8–1 limits as amended in 1978 apply to his case. Under that set of amendments, a class X (replacing class 1) felony is punishable by a sentence not less than 6 years and not more than 30 years." Ill.Rev.Stat. ch. 38, ¶ 1005–8–1(a)(3) (1979). But this newer provision does "not apply to the [p]rosecution for any violation of law occurring before the effective date of this amendatory Act of 1977," which is February 1, 1978. Ill.Rev.Stat. ch. 38, ¶ 1008–2–4(b) (1987). While the question of whether Walker's sentence had reached final adjudication by January 1, 1973, thereby triggering the 1973 statute, is contested by the parties, there is no doubt that his case was closed on February 1, 1978.

**9.** The appellate court in the mandamus proceeding overlooked this fact apparently because Walker did not bring it to their attention. O'Leary's failure to acknowledge the *certiorari* petition is less understandable, for Walker not only refers to it in his petition for habeas corpus but also mentions it in his briefs and appends to his reply brief a letter addressed to Walker from the clerk of the United States Supreme Court dated February 20, 1973 informing him that "the Court today denied the petition for a writ of certiorari" in his case.

In determining the applicability of the 1973 statute, therefore, we must decide whether a pending petition for *certiorari* serves to postpone final adjudication or whether it is considered to be a post-adjudication proceeding. Interpreting the meaning of "final adjudication," the Supreme Court of Illinois, adopting the interpretation of several Illinois appellate courts, seems to suggest that consideration by the U.S. Supreme Court constitutes part of the adjudication of a case:

> [A] case has not been finally adjudicated within the meaning of this [¶ 1008-2-4] language until the last *direct appeal* has been decided, or the time for filing such an appeal has expired.

*People v. Chupich*, 53 Ill.2d 572, 581–82, 295 N.E.2d 1, 7 (1973) (emphasis added) (citations omitted); *accord, People v. Harvey*, 53 Ill.2d 585, 294 N.E.2d 269 (1973); *see also People v. McAfee*, 23 Ill.App.3d 788, 320 N.E.2d 84 (1974) (abstract only). *Certiorari* review, which is nothing more than discretionary appellate review, is clearly direct, as opposed to collateral, review. Moreover, in the Fourth Amendment context, the U.S. Supreme Court has held that a judgment of conviction is not final until "the availability of appeal [is] exhausted, and the time for petition for certiorari has elapsed." *Linkletter v. Walker*, 381 U.S. 618, 622 n. 5, 85 S.Ct. 1731, 1734 n. 5, 14 L.Ed.2d 601 (1965); *see also Allen v. Hardy*, 478 U.S. 255, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986). We conclude that Walker's case had not reached final adjudication by January 1, 1973, and therefore his sentence should have been recalculated to conform with ¶ 1005-8-4(c).

Before determining that Walker is entitled to *habeas corpus* relief, however, we must be satisfied that this error rises to a constitutional magnitude. *See McGee v. Eyman*, 310 F.2d 230, 232 (9th Cir.1962). There is no general requirement that a sentencing statute be applied retroactively to prisoners sentenced under prior law. *United States ex rel. Scott v. Illinois Parole and Pardon Board*, 669 F.2d 1185, 1192 (7th Cir.), *cert. denied*, 459 U.S. 1048, 103 S.Ct. 468, 74 L.Ed.2d 617 (1982). However, if a state chooses to apply such a statute retroactively—especially where, as here, the legislature provides for such retroactive application—that practice may become protected. *Cf. McKinney v. George*, 726 F.2d 1183, 1189 (7th Cir.1984) ("a state can if it wants confer extra liberties which the due process clause will then also protect"). Here, Walker alleges the Department's failure to recalculate his sentence amounts to a violation of his Fourteenth Amendment equal protection and due process rights.

### 1. Equal Protection

The record before us suggests that this failure to apply the 1973 statute may have been merely an unintentional oversight. Indeed, it appears that Walker never alerted the *mandamus* court about his pending *certiorari* petition, and it seems quite plausible that the Department was simply unaware of this continuing activity in Walker's case. Without proof of discriminatory intent, an equal protection claim cannot lie:

> [T]he "Equal Protection Clause has long been limited to instances of purposeful or invidious discrimination rather than erroneous or even arbitrary administration of state powers. The gravamen of equal protection lies not in the fact of deprivation of a right but in the invidious classification of persons aggrieved by the state's action." ... A plaintiff "must demonstrate intentional or purposeful discrimination" to show an equal protection violation.... [Discriminatory purpose] implies that the decisionmaker singled out a particular group for disparate treatment and selected his course of action at least in part for the purpose of causing its adverse effects on the identifiable group.

*Shango v. Jurich*, 681 F.2d 1091, 1104 (7th Cir.1982) (citations omitted); *cf. Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (proof of racially discriminatory intent or purpose necessary to succeed under strict scrutiny standard).

Walker does not allege any sort of discriminatory policy under which he was denied the benefits of the new sentencing

statute while others similarly situated enjoyed them. Neither does O'Leary offer any evidence that non-application was an unintentional mistake, however. Indeed, it is quite plausible that some administrative policy of which we are not aware exists directing the Department of Corrections to apply the 1973 statute to all prisoners with direct appeals pending, except where that appeal is a petition for *certiorari* before the U.S. Supreme Court. Because a lenient standard is appropriate when considering a *pro se* petition, *see Hossman v. Blunk,* 784 F.2d 793, 797 (7th Cir.1986) (citing *Haines v. Kerner,* 404 U.S. 519, 520–21, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972) (*per curiam*)), and because O'Leary fails to treat this issue, we cannot decide now as a matter of law that nonapplication of the 1973 law to Walker's sentence was unintentional and therefore not vulnerable to equal protection attack. We therefore reserve judgment and await further development of the record on this issue. We leave open the question of whether an intentional policy to deny application of the statute to prisoners with *certiorari* petitions pending would survive rational basis scrutiny under the equal protection clause.

### 2. Due Process

■ Walker's petition clearly does not state a claim for a violation of his substantive due process rights; that protection is limited to "the specific guarantees in the Bill of Rights" and " 'those personal immunities that are "implicit in the concept of ordered liberty" . . . .' " *Toney–El v. Franzen,* 777 F.2d 1224, 1227 (7th Cir.1985), *cert. denied,* 476 U.S. 1178, 106 S.Ct. 2909, 90 L.Ed.2d 994 (1986) (quoting *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965)). Whatever that concept may include, it does not cover the accidental *or* intentional failure to apply a favorable sentencing statute. Although not as obvious, we think that Walker has similarly failed to show a violation of his procedural due process rights. To the extent that the deprivation is intentional—that is, to the extent that Walker can show a conscious administrative policy to withhold the benefits of the 1973 law to prisoners like Walker with *certiorari* petitions pending—then Walker would have no liberty interest in the retrospective application of the law and the due process clause would not be implicated; as discussed *supra,* a state need not apply a sentencing statute to prisoners sentenced before its effective date absent a statute or established practice providing for retrospective application. Similarly, the due process clause is not triggered to the extent the deprivation is the result of an unintentional, even negligent, mistake. *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); *accord, Davidson v. Cannon,* 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986).

Finally, if the error in this case is intentional but random and unauthorized—that is, not due to established state policy—the due process clause becomes relevant, but the *Parratt/Hudson* line of authority teaches that no violation has occurred because the process afforded by the state, the post-deprivation *mandamus* proceeding, is sufficient to protect Walker's liberty interest. *See Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981); *Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). To be sure, the *mandamus* proceeding did not catch the error in this case, but that omission seems to be due to Walker's failure to bring evidence of his pending *certiorari* petition to the court's attention rather than to an inherent loophole in the system. *Cf. Easter House v. Felder,* 879 F.2d 1458, 1473–74 (7th Cir.1989) (*en banc*) (distinguishing *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982), on this basis). Even without clarification on the question of whether the deprivation was intentional, we are able to conclude that no violation of Walker's due process rights occurred.

### C. *Election of a Fixed Release Date*

■ The Amendments to the Unified Code of Correction that went into effect on February 1, 1978, include a provision requiring the Prisoner Review Board to "provide each prisoner sentenced under the law

in effect prior to the effective date of this Amendatory Act of 1977, with a fixed release date." Ill.Rev.Stat. ch. 38, ¶ 1003–3–2.1(a) (1987). This requirement, however, is subject to the limitation in subparagraph (b):

> No release date under this Section shall be set for any person sentenced to an indeterminate sentence under the law in effect prior to the effective date of this Amendatory Act of 1977 in which the minimum term of such sentence is 20 years or more.

Walker, who continues to serve an indeterminate sentence, claims that he was denied application of this provision in violation of the Constitution. We cannot agree. On the effective date of that provision, Walker's minimum sentence of record was 219 years; it was on this sentence that the Prisoner Review Board clearly relied in refusing to give Walker a fixed release date. Had the 1973 sentencing statute been applied to Walker, as it should have, this minimum sentence might have been changed. But that statute confers broad discretion in setting a minimum, and we consider it highly improbable—indeed unfathomable—that his sentence would have been reduced by 199 years or more. Such a purely hypothetical and unlikely scenario cannot trigger ¶ 1003–3–2.1, nor can it render the initial decision not to apply the statute erroneous.

### D. *Parole Eligibility*

Walker next alleges a violation of his right to be considered for parole under Ill.Rev.Stat. ch. 38, ¶ 1003–3–3 (1987), which sets forth time frames for parole eligibility. The gravamen of Walker's complaint is not clear from his filings—although he explicitly refers to a violation of ¶ 1003–3–3(c) he also alleges a violation of ¶ 1003–3–3 generally, suggesting that his argument is not limited to subparagraph (c) of the provision. In ignoring this claim completely, O'Leary does little to help define the issue.

It is clear that Walker cannot succeed on his claim of a ¶ 1003–3–3(c) violation. By its own terms, that provision applies only to those persons "sentenced to imprisonment under this amendatory Act of 1977 or given a release date under Section 3–3–2.1 of this Act." It is thus inapplicable to Walker, who was sentenced prior to 1978 for a minimum term greater than 20 years. *See United States ex rel. Scott,* 669 F.2d at 1192. The only subparagraph of ¶ 1003–3–3 that appears relevant to Walker's case is (a), which provides:

> (a) ... every person serving a term of imprisonment under the law in effect prior to the effective date of this amendatory Act of 1977 shall be eligible for parole when he has served:
>
> > (1) the minimum term of an indeterminate sentence less time credit for good behavior, or 20 years less time credit for good behavior, whichever is less.... [10]

The record contains some question as to whether this provision was properly applied to Walker. His sentence calculation worksheet reflects the fact that the ¶ 1003–3–3(a) formula was applied to his minimum sentence to determine an initial parole eligibility date of December 20, 1977, but that date and the calculation were scratched out and a handwritten annotation was added to the worksheet, presumably at the same time, stating, "No Longer a Min. Case Cont. 2/89 Docket." While it is likely that these scribbles were added when Walker first became eligible for parole and had his first hearing—and indeed Walker adverts to several parole hearings that he has been granted—it is also possible that they denote an arbitrary denial of an initial eligibility hearing in violation of ¶ 1003–3–3(a), and we are reluctant to rule against Walker on this issue without any affirmative, direct evidence refuting his charges of irregularities in the determination of his parole eligibility. We therefore decline to decide this issue for now and ask the parties to address it in further detail.

---

**10.** This provision excludes "those offenders who accept the fixed release date established by the Prisoner Review Board under Section 3–3–2.1." ¶ 1003–3–3(a); *see also* ¶ 1003–3–3(b).

E. *Application of Parole Criteria*

 Walker's final allegation challenges the set of parole criteria used in determining his eligibility as an invalid *ex post facto* law. Although Walker did not present this claim to the *mandamus* court, thereby denying the state system "a fair opportunity to apply constitutional principles and correct any constitutional error," *United States ex rel. Sullivan v. Fairman,* 731 F.2d 450, 453 (7th Cir.1984), O'Leary does not raise this argument, and because the issue is so easily resolved, we choose to decide it now.

In 1973, the Illinois legislature amended the parole eligibility criteria, basing the changes on the Model Penal Code. Ill.Rev. Stat. ch. 38, ¶ 1003-3-5 (1973). Walker, relying on the Seventh Circuit's opinion in *Welsh v. Mizell,* 668 F.2d 328 (7th Cir.), *cert. denied,* 459 U.S. 923, 103 S.Ct. 235, 74 L.Ed.2d 186 (1982), argues that the new criteria add an element of general deterrence—deterrence of society in general—to the criteria that were in effect when Walker committed his crimes in 1966, which focused on special deterrence—deterrence of the specific prisoner. Use of the new criteria in determining his parole eligibility, Walker alleges, therefore violates the *ex post facto* clause.

*Welsh v. Mizell,* which found a violation in an identical situation, was overruled two years later by the Seventh Circuit in *Heirens v. Mizell,* 729 F.2d 449 (7th Cir.), *cert. denied,* 469 U.S. 842, 105 S.Ct. 147, 83 L.Ed.2d 85 (1984). The *Heirens* court held that general deterrence had in fact been a valid consideration by the Parole Board even before the 1973 statutory revision, which made this criterion explicit, and therefore the new law merely codifies existing practice. 729 F.2d at 463. The *Heirens* opinion compels us to conclude that the Parole Board made no error in relying on the later-enacted criteria.

## CONCLUSION

For the foregoing reasons, Walker's motion for summary judgment is denied. O'Leary's motion for summary judgment is granted in part. Resolution of Walker's sentencing-recalculation and parole-eligibility claims awaits further development of the record.